772 A.2d 386

JOHN FINK, AS ADMINISTRATOR AD PROSEQUENDUM AND ADMINISTRATOR OF THE ESTATE OF LISA M. FINK, DECE-DENT, PLAINTIFF-APPELLANT, v. ROBERT M. THOMPSON, M.D., AUDREY SUTTON-SURAK, D.O., ROBERT LIEGNER, M.D., CHRIS ANAYIOTOS, M.D., MERIDIAN HEALTH CARE SYSTEMS, RIVERVIEW MEDICAL CENTER, RIVERVIEW EMERGENCY PHYSICIANS, ROBERT WOOD JOHNSON UNI-VERSITY HOSPITAL, XYZ, INC., (FICTITIOUS CORPORA-TION), MICHAEL NOLLEDO, M.D., "JOHN DOE, M.D." 1–10, "ROBERT ROE" 1–10 AND "JANE ROE" 1–10 (FICTITIOUS NAMES) AS AGENTS, SERVANTS, EMPLOYEES, AND/OR HOLDING PRIVILEGES OF MERIDIAN HEALTH CARE SYS-TEMS, RIVERVIEW MEDICAL CENTER, RIVERVIEW EMER-GENCY PHYSICIANS, AND ROBERT WOOD JOHNSON UNI-VERSITY HOSPITAL, DEFENDANTS,RICHARD STROBEL, M.D., AND UNIVERSITY OF MEDICINE AND DENTISTRY OF NEW JERSEY, DEFENDANTS-RESPONDENTS.

Argued January 29, 2001—Decided May 31, 2001.

552

Michael D. Schottland, argued the cause for appellant (Schottland, Manning, Rosen & Caliendo, attorneys; Vincent P. Manning, on letter brief).

Matthew S. Schorr, argued the cause for respondents (McDonough, Korn & Eichhorn, attorneys).

William L. Gold, argued the cause for amicus curiae, Association of Trial Lawyers—New Jersey (Bendit Weinstock, attorneys).

The opinion of the Court was delivered by

LaVECCHIA, J.

This is another appeal concerning the Affidavit of Merit statute, N.J.S.A. 2A:53A–26 to –29. The issue again is whether plaintiff's case must be dismissed for failure to timely file an affidavit of merit setting forth an expert's sworn statement that there is a reasonable probability that the defendant's conduct deviated from acceptable standards of professional due care. N.J.S.A. 2A:53A–27.

I.

Decedent Lisa Fink became seriously ill in late August 1996. Her symptoms included headaches associated with virus and accompanying fever. She experienced neck pain, unsteadiness, and weakness in her legs. Over a short period of time she became increasingly confused. On August 28, 1996, she was advised in a telephone conversation with her primary care physician, Dr. Audrey Sutton–Surak, to take Motrin. That advice was supplementary to that previously given by Dr. Sutton–Surak's medical associate, Dr. Thompson.

The next morning, August 29, 1996, Fink had to be physically assisted by her husband to her office visit with Dr. Sutton–Surak. Dr. Sutton–Surak consulted with a neurologist and immediately sent Fink to Riverview Hospital. At 5:00 p.m. on that day, Dr. Sutton–Surak visited Fink at the Riverview Hospital emergency room and observed her sitting up in a wheelchair, alert and oriented. While at the hospital, Fink came under the care of a neurologist, Dr. Anayiotes, who recommended that an MRI be performed, and accordingly she was admitted to the hospital.

On August 30 at 10:00 a.m., Dr. Sutton–Surak again saw Fink at the hospital and this time described her as in a "confused" state. Sutton–Surak was informed that the neurologist intended to perform a spinal tap on Fink that day. In addition, Dr. Anayiotes ordered ampicillin in dosages administered at 2:00 p.m., 6:00 p.m., and 10:00 p.m. According to Sutton–Surak, Dr. Anayiotes suspected that Fink might have listeria meningitis (listeria), although Fink did not fit the typical profile of a patient likely to have listeria. Ampicillin is the drug of choice to treat listeria.

As Fink's condition worsened, Dr. Sutton–Surak determined that it would be best to transfer her to Robert Wood Johnson University Hospital (Robert Wood Johnson). According to Sutton–Surak, she spoke with Dr. Michael Nolledo, a resident at Robert Wood Johnson, concerning the patient transfer and related the following information: that Fink's spinal tap fluid was not clear and that the neurologist at Riverview Hospital suspected

listeria and prescribed ampicillin. She recalled the resident saying he would speak to his attending physician and call her back to advise if the hospital would accept a transfer of the patient. According to Sutton–Surak, Nolledo called back at approximately 6:00 p.m. on August 30th and advised her that his attending physician, Dr. Strobel, authorized Fink's transfer. Fink arrived at Robert Wood Johnson at approximately 11:00 p.m. that night.

Whether that conversation occurred is among the many disputed facts in this record, because Dr. Nolledo in his deposition testified that he did not recall participating in a conversation with Dr. Sutton–Surak on August 30. He stated that he believed his attending physician, Dr. Strobel, talked directly to Dr. Sutton–Surak and that he, Nolledo, learned about Fink's condition after Dr. Strobel had accepted the transfer. Nolledo further testified that he recalled Strobel telling him that Fink was diagnosed with some form of meningitis, but Nolledo had no recollection that there was an indication of listeria.

Dr. Strobel similarly stated in his deposition that it was he who spoke to a "female doctor" regarding plaintiff's transfer to Robert Wood Johnson from Riverview. He said that in that conversation he was not told of listeria, but only that Fink suffered from some form of meningitis. Although he did not recall a discussion about a prescription for ampicillin, Dr. Strobel admitted that it was his habit to ask about all medications a patient was taking when a patient was seeking transfer into Robert Wood Johnson.

Following Fink's arrival at Robert Wood Johnson, Dr. Strobel, the attending physician who was at home on call that night, was telephoned at approximately midnight. Dr. Nolledo "presented" the patient to him telephonically. That presentation included a report from an infectious disease resident, Dr. Solanki, who examined Fink upon her arrival. Strobel asked during the presentation about evidence of increased intracrannial pressure. He stated that he was told that Fink's optic discs were flat and that her neurologic exam was not abnormal.

Fink's medical records reveal that there is an unsigned entry indicating a decision at 1:30 a.m. to order ampicillin for Fink. A second unsigned entry at 1:37 a.m. canceled the ampicillin. The authorship of those unsigned orders in Fink's medical records was the source of confusion for a considerable time during this litigation. It was revealed later in Dr. Strobel's deposition, after he had been dismissed from the action, that he had directed Nolledo to stop the ampicillin, but to obtain first an infectious-disease consultation. Strobel stated that he presumed that the ampicillin was stopped pursuant to the 1:37 a.m. medical records entry because the infectious disease resident with whom Nolledo consulted agreed with that course of action.

At 9:35 a.m. on August 31, while at the hospital, Dr. Strobel received a call from the Riverview Hospital laboratory informing him of the results of Fink's spinal fluid testing. The results indicated listeria. According to entries in Fink's medical records, Dr. Strobel promptly ordered the recommencement of ampicillin, but Fink already had begun to have cardiac problems, and her brain stem herniated. She passed away later that day. Plaintiff's expert concluded that Fink "died of listeria meningitis and increased intracrannial pressure."

Plaintiff's pre-suit expert report contained a detailed explanation of the negligence of each of the doctors who cared for Fink prior to her transfer to Robert Wood Johnson, as well as a description of Riverview Hospital's negligence. The report referred in two respects to the institutional negligence of Robert Wood Johnson, without attempting to differentiate concerning theories of negligence by unnamed residents and what they did and did not do and what they did or did not discuss with their attending physician. The attending physician was not identified in that paragraph by name but was mentioned earlier as Dr. Strobel. It provided in part:

Negligence: Robert Wood Johnson Hospital

Prior to transfer to Robert Wood Johnson Hospital after analyzing the spinal fluid, [the neurologist] concluded in a progress note that even though Ms. Fink was not immunocompromised, she could still have listeria infection. The resident

physicians admitting Ms. Fink to Robert Wood Johnson Hospital knew or should have discussed with their attending that listeria meningitis requires Ampicillin. If the resident physicians were aware of [the neurologist's] opinion, then their failure to continue Ampicillin without justification constituted a breach of the standard of care. If they were unaware of [the neurologist's] opinion because his opinion was not included in the transfer, they had a duty to determine why she was on Ampicillin before stopping it and the failure to do so constituted a breach of the standard of care.

. . . .

When Ms. Fink suffered a bout of ventricular tachycardia at about 5:00 a.m. on August 31, 1996, the doctors had a duty to determine why she suffered this arrhythmia. Included in the differential diagnosis was sepsis, brainstem inflammation and ischemia, and increased intracrannial pressure from hydrocephalus and edema. The failure to consult a neurologist or a neurosurgeon or to perform a CT scan immediately after reestablishing a normal cardiac rhythm constituted a breach of the standard of due care.

Fink's husband, as executor of her estate, filed suit against Riverview, the pre-Robert Wood Johnson doctors, Thompson, Liegner, Anayiotes, and Sutton–Surak, Robert Wood Johnson, its attending physician Strobel, and unnamed physicians and employees of Robert Wood Johnson. A timely affidavit of merit was filed by plaintiff on August 14, 1998, listing by name the pre-Robert Wood Johnson doctors who cared for plaintiff, and unknown physicians of Riverview and Robert Wood Johnson. Strobel was not specifically identified in the cursory opinion contained in the affidavit provided by the same expert who provided the detailed pre-suit expert report that had identified Strobel as playing a role in Robert Wood Johnson's handling of the patient care delivered to Fink. That initial affidavit provided:

It is my opinion, within a reasonable degree of medical certainty that the demise of decedent, Lisa Fink, was proximately caused by a deviation from accepted medical standards of care of the following physicians, nurses and hospitals: R. Liegner, M.D., Chris Anayiotos, M.D., Roger M. Thompson, M.D., Audrey Sutton–Surak, D.O., and by Riverview Emergency Physicians, currently unknown names of physicians and nurses of Robert Wood Johnson University Hospital. Upon further discovery, i.e., depositions of defendants I have the right to supplement.

More than 120 days later, Strobel moved to dismiss because the affidavit filed did not identify him. Plaintiff immediately filed a supplemental affidavit in March 1999 in which the expert added:

In addition, it has become known to me that defendant, Richard Strobel, M.D., was the attending physician at Robert Wood Johnson University Hospital and therefore can now be identified as one of the unknown physicians of Robert Wood Johnson University Hospital who deviated from accepted standards of care in his treatment of the decedent, Lisa M. Fink.

Plaintiff filed a subsequent affidavit in August 1999 that elaborated on that March 1999 affidavit. The expert explained that Fink's medical records were unclear and, in the case of Robert Wood Johnson, plagued by illegibility, and therefore he had been unable to allocate responsibility fully as among the various named and unnamed defendants. The Law Division dismissed the complaint as to Strobel for failure to comply with the affidavit of merit statute, and the Appellate Division denied review.

We granted leave to appeal, 165 *N.J.* 129, 754 *A.*2d 1207 (2000).

## II.

The Affidavit of Merit statute contains several provisions delineating the requirements for a plaintiff's submission of an affidavit of merit. The statute mandates:

In any action for damages for personal injuries, wrongful death or property damage resulting from an alleged act of malpractice or negligence by a licensed person in his profession or occupation, the plaintiff shall, within 60 days following the date of filing of the answer to the complaint by the defendant, provide each defendant with an affidavit of an appropriate licensed person that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional or occupational standards or treatment practices. The court may grant no more than one additional period, not to exceed 60 days, to file the affidavit pursuant to this section, upon a finding of good cause.

[*N.J.S.A.* 2A:53A–27.]

A plaintiff may file a sworn statement in lieu of an affidavit when "the defendant has failed to provide plaintiff with medical records or other records or information having a substantial bearing on preparation of the affidavit" within forty-five days after plaintiff requests those records by certified mail or personal service and provides the defendant with a signed authorization, if necessary. *N.J.S.A.* 2A:53A–28. If a plaintiff fails to provide either an affidavit pursuant to *N.J.S.A.* 2A:53A–27, or a sworn statement in

lieu of an affidavit pursuant to *N.J.S.A.* 2A:53A–28, "it shall be deemed a failure to state a cause of action." *N.J.S.A.* 2A:53A–29.

■ Our case law implementing the statute has acknowledged repeatedly that the primary purpose of the statute is "to require plaintiffs in malpractice cases to make a threshold showing that their claim is meritorious, in order that meritless lawsuits readily could be identified at an early state of litigation." *In re Petition of Hall,* 147 *N.J.* 379, 391, 688 *A.*2d 81 (1997) (citing Peter Verniero, Chief Counsel to the Governor, *Report to the Governor on the Subject of Tort Reform* (Sept. 13, 1994)); *see Galik v. Clara Maass Med. Ctr.,* 167 *N.J.* 341, 771 *A.*2d 1141 (2001); *Burns v. Belafsky,* 166 *N.J.* 466, 474–75, 766 *A.*2d 1095 (2001); *Cornblatt v. Barow,* 153 *N.J.* 218, 242, 708 *A.*2d 401 (1998). The statute is designed to ferret out frivolous lawsuits at an early point in the litigation. Requiring a threshold showing of merit balances the goal of reducing frivolous lawsuits and the imperative of permitting injured plaintiffs the opportunity to pursue recovery from culpable defendants. *Burns, supra,* 166 *N.J.* at 474, 766 *A.*2d 1095.

### III.

#### A.

The overarching issue in this case is whether plaintiff complied with the requirements of the Affidavit of Merit statute. Plaintiff contends that he complied with *N.J.S.A.* 2A:53A–27 by timely submitting the August 14, 1998 affidavit to defendant Strobel. That affidavit, however, did not refer to defendant by name in its listing of physicians and hospitals allegedly deviating from the acceptable standards of medical care. Plaintiff argues, among other things, that the August 1998 affidavit technically satisfied the statute with respect to Strobel because the affidavit referred to "unknown" physicians, which plaintiff asserts included Strobel.

The statute explicitly states that a plaintiff must provide "each defendant" with an affidavit that indicates the plaintiff's claim has

merit. *N.J.S.A.* 2A:53A–27. The question then is whether the plaintiff must provide each defendant with an affidavit stating that the plaintiff's claim against that specific defendant has merit. The statute does not directly impose such a requirement. As the Court noted in *In re Petition of Hall*, in addressing another aspect of the statute, "[f]ailure to file an affidavit of merit concerning a specific defendant constitutes a failure to state a cause of action against that defendant". *In re Petition of Hall, supra*, 147 *N.J.* at 390, 688 *A.*2d 81 (citing *N.J.S.A.* 2A:53A–29). That is the only interpretation of the statute that would further its purpose. *N.J.S.A.* 2A:53A–27 requires that a plaintiff provide an affidavit to each defendant detailing a reasonable probability that at least one claim concerning each defendant has merit. If a plaintiff were permitted to name fifteen defendants and provide each with an affidavit specifying only that a claim against one defendant is meritorious, the statutory purpose of reducing frivolous lawsuits would be subverted or circumvented. *Cf. HCA Health Servs. of Ga., Inc. v. Hampshire*, 206 *Ga.App.* 108, 424 *S.E.*2d 293, 296 (1992) (concluding that statute designed to reduce meritless lawsuits would be undermined if plaintiffs were permitted to name "professionals as defendants in malpractice suits in which a plaintiff can set forth no one negligent act or omission attributable to that defendant, thus sanctioning the filing of frivolous malpractice suits against professional defendants who are only tangentially related to the legitimate malpractice claim brought against another defendant").

█ Given our conclusion that the statute demands that a plaintiff demonstrate merit with regard to at least one claim against each named defendant, plaintiff's contention that the reference to "unknown" physicians satisfies the statute with regard to the claim against Strobel is unavailing. The August 14 affidavit failed to include specific reference to Strobel, and therefore the expert's sworn statement does not attest to the merit of plaintiff's suit as against that defendant. Plaintiff's supplemental affidavits of March 11, 1999 and August 19, 1999, naming Strobel, were

untimely. In sum, strict compliance with the requirements of the statute was lacking.

## B.

■ The question remains, however, whether plaintiff substantially complied with the statute. The doctrine of substantial compliance requires that a defaulting party demonstrate the following:

(1) lack of prejudice to the defending party; (2) a series of steps taken to comply with the statute involved; (3) a general compliance with the purpose of the statute; (4) a reasonable notice of petitioner's claim, and (5) a reasonable explanation why there was not a strict compliance with the statute.

[*Cornblatt, supra,* 153 *N.J.* at 239, 708 *A.*2d 401 (quoting *Bernstein v. Board of Trustees of Teachers' Pension and Annuity Fund,* 151 *N.J.Super.* 71, 76–77, 376 *A.*2d 563 (App.Div.1977)).]

When we construed the statute in *Cornblatt,* we held that "there is nothing reflective in the objectives of the Affidavit of Merit Bill or its history that suggests the Legislature intended to foreclose the familiar doctrine of substantial compliance in the affidavit of merit context." *Id.* at 240, 708 A.2d 401. We stated then that a court in appropriate circumstances may invoke the doctrine of substantial compliance "to 'avoid technical defeats of valid claims.'" *Id.* at 239, 708 A.2d 401 (quoting *Zamel v. Port of N.Y. Auth.,* 56 *N.J.* 1, 6, 264 *A.*2d 201 (1970)). More recently, the applicability of the doctrine of substantial compliance to the Affidavit of Merit statute was explicated fully in our decision in *Galik, supra.* Accordingly, we consider whether this plaintiff can demonstrate substantial compliance.

A review of the "series of steps" plaintiff took to comply with the statute reveals that Strobel was served first with a complaint that contained generalized assertions of professional negligence against him that were essentially identical to the allegations in the counts against Robert Wood Johnson and the unnamed physicians and health care professionals at Robert Wood Johnson who rendered care to Fink. Those allegations against Strobel, Robert Wood Johnson, and Riverview were also similar in all pertinent

respects to the counts against the other individually named doctors who cared for Fink before her transfer to Robert Wood Johnson.

Strobel was then served with a timely copy of the affidavit of merit of plaintiff's expert containing its brief conclusory paragraph, and he also received the extensive pre-suit expert report that accompanied it. The latter report is significant. In that document Strobel's actions are thrice mentioned in the discussion of the sequence of events that occurred while Fink was in the care of Robert Wood Johnson. Notably, the pre-suit report includes an opinion concerning the overall negligence of Robert Wood Johnson, and fairly extensively addresses the actions or inactions of the unnamed residents at Robert Wood Johnson who accepted Fink's transfer pursuant to Strobel's authorization and started her care under the supervision of that attending physician. That expert report refers to Strobel in three capacities: (1) as the "attending physician" at Robert Wood Johnson, (2) as a doctor who "signed off" on one of the Robert Wood Johnson resident's orders in Fink's medical records, and (3) as the doctor under whose care the transfer of the decedent to Robert Wood Johnson was effected. It also concludes by asserting that "the failure to continue ampicillin on admission to Robert Wood Johnson Hospital contributed to Ms. Fink's death by allowing the listeria meningitis to inflame and damage the brain and allow for further increase in intracrannial pressure." Thus, Strobel had a clear statement of the theory of negligence that contributed to Fink's death, namely the stopping of the ampicillin and the expert's opinion concerning the theory's validity. He also was aware of his role in stopping the ampicillin, although that role had not yet been disclosed in the litigation.

At the time of Strobel's motion to dismiss for failure to comply with the Affidavit of Merit statute, plaintiff's counsel contended that Strobel was named in the complaint because his was the only legible name in Robert Wood Johnson's medical records for Fink. Moreover, because the time for filing the complaint was running out (the complaint in this wrongful death action was filed exactly

two years to the day from Fink's death), and because Strobel was "known" to plaintiff, although his actions and inactions were not known, counsel explained that she believed that a "John Doe" filing was impermissible under *Rule* 4:26–4. At the time that the affidavit of merit had to be filed, however, Strobel's specific direct activities were not identified, and it was not clear what interactions he did or did not have with the residents on duty that night. We note that plaintiff moved to take Strobel's deposition, but that the deposition did not occur until Strobel's motion to dismiss had been granted. Because of those circumstances, counsel argued that the affidavit of merit's reference to unnamed physicians—not unnamed residents—was intended to capture Strobel, who was known to play a role in the care of Fink, although the nature or scope of his specific deviations were still to be determined through discovery.

We accept counsel's representation that, at the time the affidavit of merit was served, plaintiff was uncertain concerning the theories of direct liability that were available against Strobel. Counsel's explanation is supported by plaintiff's timely service on Strobel of that earlier affidavit and the expert's pre-suit report, which mentioned Strobel's involvement and the theory that the negligent cessation of ampicillin contributed to Fink's death. Later depositions revealed that Strobel, as the supervising physician, had personally ordered that administration of ampicillin cease. In his deposition, Strobel acknowledged his conscious decision to stop ampicillin. He also confirmed his responsibility to train and evaluate the performance of the residents under his charge, including residents who cared for Fink after her transfer to Robert Wood Johnson. He thus had both direct and vicarious involvement in Fink's case.

We are sympathetic to the confusion of counsel about the handling of Strobel as a named defendant at the time of the filing of the complaint and in the affidavit of merit, initially and as supplemented. Faced with the hard reality of the two-year statute of limitations and knowing Strobel's identity, but not his

precise involvement in Fink's care, counsel took the "safer" course of naming him as a defendant. Having done so, the affidavit of merit should have been worded more clearly concerning what "unnamed physicians" meant to capture. And, if pre-suit depositions were not realistically possible, then resort to depositions should have occurred promptly after the filing of the complaint so as to timely comply with the Affidavit of Merit statute. Attorneys should not rely on an intention to conduct later discovery to excuse noncompliance with *N.J.S.A.* 2A:53A–27 but, rather, should begin discovery promptly when facts are needed to comply with the requirements of the Affidavit of Merit statute. In this case, discovery of crucial areas of fact did not occur with great expedition. We urge counsel to time their discovery—with court intervention if necessary—so that facts necessary to comply with *N.J.S.A.* 2A:53A–27 are available by the statutory deadlines.

Nonetheless, Strobel was timely served with an affidavit and an extensive medical expert's report that clearly focused on his conduct and on the totality of the circumstances attending Robert Wood Johnson's acceptance of Fink into its care under Strobel's authorization. That expert's report unequivocally questioned the performance of the unnamed residents by specifically referencing the quality of their professional interaction with the attending physician and also clearly explained that the negligent stopping of ampicillin played a causative role in Fink's death. Because discovery of additional facts was necessary to clarify the roles of the various Robert Wood Johnson participants in respect of Fink's death, the expert's failure to assert a specific theory of liability against Strobel at that time should not preclude plaintiff's suit. Plaintiff's actions constitute a good faith effort and substantial compliance with the Affidavit of Merit statute.

In conclusion, the omission of Strobel's name from the initial affidavit of merit must be regarded as a failure to comply strictly with the statute. However, Strobel was not prejudiced by the lapse in strict compliance, and plaintiff has offered a reasonable explanation for that lapse. Although not named in the affidavit,

Strobel was prepared for suit after receiving the complaint, the expert report, and the affidavit. Evidence was not lost, and permitting plaintiff's case to proceed would not result in undue additional defense costs. *Mayfield v. Community Med. Assocs.*, 335 *N.J.Super.* 198, 207, 762 *A.*2d 237 (App.Div.2000).

### IV.

We hold that plaintiff substantially complied with the Affidavit of Merit statute. The judgment of the Law Division is reversed, and the matter is remanded.

For reversal and remandment—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, LaVECCHIA and ZAZZALI—6.

*Opposed*—None.