961 A.2d 704

WALTER SROCZYNSKI, PETITIONER–RESPONDENT, v. JOHN MILEK, T/A JOHN MILEK CONSTRUCTION, RESPONDENT, AND NEW JERSEY MANUFACTURERS INSURANCE COMPANY, RESPONDENT–APPELLANT, AND UNINSURED EMPLOYER'S FUND, RESPONDENT–RESPONDENT, AND ROBERT WOOD JOHNSON UNIVERSITY HOSPITAL, INTERVENOR–RESPONDENT.

Argued May 5, 2008—Decided December 17, 2008.

38

*Michael J. Marone* argued the cause for appellant (*McElroy, Deutsch, Mulvaney & Carpenter,* attorneys; *Mr. Marone* and *Richard J. Williams,* Jr., of counsel and on the briefs).

*David Hoffman* argued the cause for respondent Walter Sroczynski (*Wysoker, Glassner, Weingartner, Gonzalez & Lockspeiser,* attorneys).

*William L. Boyan* argued the cause for respondent Uninsured Employer's Fund.

*Donna Marie Montano* argued the cause for intervenor-respondent Robert Wood Johnson University Hospital (*Celentano, Stadtmauer & Walentowicz,* attorneys; *Steven Stadtmauer,* of counsel and on the briefs).

*Jerome J. Graham, Jr.,* submitted a brief on behalf of *amici curiae* Property Casualty Insurers Association of America and Insurance Council of New Jersey (*Graham Curtin,* attorneys; *Mr. Graham* and *George C. Jones,* on the brief).

PER CURIAM.

New Jersey Manufacturers Insurance Company (NJM) issued a standard Workers' Compensation and Employer's Liability Insurance Policy to John Milek Construction (Milek) covering the period from May 6, 2003 to May 6, 2004. Milek ceased making payments on the policy after the initial premium was satisfied. As a result, on August 14, 2003, NJM sent Milek a notice of cancella-

tion by certified mail. On August 15, 2003, NJM notified the New Jersey Commissioner of Banking and Insurance of the cancellation, using an electronic file transfer protocol (FTP) established by the New Jersey Compensation Rating and Inspection Bureau (CRIB).[1]

On February 28, 2004, petitioner, Walter Sroczynski, an employee of Milek, sustained a work-related injury. On March 17, 2004, Sroczynski filed a claim with the Division of Workers' Compensation, seeking workers' compensation benefits.

NJM moved to be relieved of responsibility for providing coverage, arguing that it had properly canceled Milek's policy almost six months earlier. Opposing NJM's motion was Sroczynski and the Uninsured Employer's Fund (UEF). Because of the significant medical costs incurred in caring for Sroczynski after his injury, the trial judge also granted Robert Wood Johnson University Hospital (RWJH) intervenor status.

At issue in the case was whether NJM satisfied *N.J.S.A.* 34:15–81, which sets forth the specific requirements for cancellation of a workers' compensation policy of insurance:

Any contract of insurance issued by a stock company or mutual association against liability arising under this chapter may be canceled by either the employer or the insurance carrier within the time limited by such contract for its expiration. *No such policy shall be deemed to be canceled until:*

*a. At least ten days' notice in writing of the election to terminate such contract is given by registered mail by the party seeking cancellation thereof to the other party thereto; and*

*b. Until like notice shall be filed in the office of the commissioner of banking and insurance, together with a certified statement that the notice provided for by paragraph "a" of this section has been given; and*

---

[1] CRIB is responsible for "establish[ing] and maintain[ing] rules, regulations, and premium rates for workmen's compensation and employer's liability insurance and equitably adjust[ing] the same, as far as practicable, to the hazard of individual risks, by inspection by the bureau." *N.J.S.A.* 34:15–89. The Commissioner supervises all of CRIB's actions, including the adoption of the rules and regulations contained in CRIB's Workers' Compensation and Employers' Liability Insurance Manual (the Manual). The Manual incorporates by reference all of the relevant statutes.

c. Until ten days have elapsed after the filing required by paragraph "b" of this section has been made.

The provisions "b" and "c" of this section shall not apply where the employer has replaced the contract to be canceled by other insurance, and notice of such replacement has been filed with the Commissioner of Banking and Insurance. In such event the notice required by provision "a" may, if given by the insurance carrier, recite as the termination date the effective date of the other insurance, and the contract shall be terminated retroactively as of that date. No notice of cancellation of any such contract need be filed in the office of the Commissioner of Banking and Insurance where the employer is not required by any law of this State to effect such insurance.

[*N.J.S.A.* 34:15–81 (emphasis added).][2]

At a plenary hearing, the Judge of Compensation heard testimony from an assistant vice president of NJM. He testified that NJM was aware of the procedures required by *N.J.S.A.* 34:15–81 to cancel workers' compensation coverage and that the notice of cancellation sent to Milek by certified mail satisfied the statute. He also claimed that NJM complied with the "like notice" and "certified statement" requirements of *N.J.S.A.* 34:15–81(b) by the electronic transfer to CRIB.

The Judge of Compensation ruled that NJM failed to cancel the policy because, as NJM acknowledged, it did not file a written "certified statement" when it transmitted data by way of the FTP. Further, the judge discounted NJM's reliance on the CRIB Manual because it "outlines the manner in which the notice is to be filed and in no way relieves the carrier from its obligation to certify the information." Finally, based on the public policy favoring the provision of workers' compensation insurance, the judge found that strict compliance with the cancellation statute was necessary

---

[2] The CRIB Manual authorizes carriers to submit cancellation notices by means of electronic transmission. Electronic submission of cancellation information can be achieved in one of two ways: in the form of a magnetic tape that includes the data prescribed in the National Workers Compensation Data Specifications Manual; or, through a secure internet connection using CRIB's FTP system that permits only the transfer of data, not documents. The Manual also includes an Approved Form for Filing Notice of Cancellation by Carrier, known as Form 116–B. Form 116–B incorporates a certification by the carrier that *N.J.S.A.* 34:15–81 has been satisfied.

to avoid allowing a carrier to evade its responsibilities and "deny the insured worker the recovery promised to him by the law."

NJM appealed, arguing that its cancellation of Milek's policy satisfied the statute and, alternatively, that the doctrine of substantial compliance applies. In rejecting those arguments, the panel focused exclusively on the purpose and meaning of the "certified statement" requirement of *N.J.S.A.* 34:15–81(b) and declared that NJM's argument would require it "to ignore a portion of the statutory scheme that the Legislature believed was important, and would in effect constitute a rewriting of the statute." *Sroczynski v. Milek,* 396 *N.J.Super.* 248, 256, 933 *A.*2d 931 (App.Div.2007). The panel also rejected NJM's argument that because NJM complied with the CRIB Manual, it complied with the statute, stating "NJM's argument ignores one of the key provisions of the manual[,]" *id.* at 255, 933 *A.*2d 931, which requires compliance with all sections of the workers' compensation statutes. Further, the panel rejected NJM's substantial compliance argument, concluding that the case does not satisfy the purpose of the substantial compliance doctrine, which is to "avoid the harsh consequences that flow from technically inadequate actions that nonetheless meet a statute's underlying purpose." *Galik v. Clara Maass Med. Ctr.,* 167 *N.J.* 341, 352, 771 *A.*2d 1141 (2001). Finally, it awarded counsel fees and costs to Sroczynski and the UEF.

We granted NJM's motion for leave to appeal from the judgment and the award of attorneys' fees to Sroczynski and to the UEF. 192 *N.J.* 591, 934 *A.*2d 635 (2007); 193 *N.J.* 272, 937 *A.*2d 975 (2007). We also granted leave to the Property Casualty Insurers Association of America (PCIA) and the Insurance Council of New Jersey (ICNJ) to participate as amici curiae.

Before us, the parties maintain the positions they advanced below. NJM argues that it complied, or at least complied substantially, with the statute, and that any contrary holding would, at best, be a new rule of law requiring purely prospective application,

and that counsel fees are not authorized. Amici PCIA and ICNJ side with that view.

Sroczynski and the UEF counter that the statute was not satisfied because of the absence of a "certified" statement, that the CRIB Manual specifically incorporates the statutory requirements, and that this case does not involve the kind of technical slip-up that substantial compliance was meant to address. In addition, they urge us to conclude that their interpretation is not a new rule of law and that counsel fees are authorized. Amicus RWJH supports that view.

We have carefully reviewed this record in light of the claims advanced and, except with respect to the award of counsel fees to the UEF, have concluded that there is no warrant for our intervention. We therefore affirm the judgment of the Appellate Division in Sroczynski's favor substantially for the reasons expressed in Judge Baxter's opinion.

We add the following. The language of *N.J.S.A.* 34:15–81 is clear and unambiguous, allowing for no interpretation other than that filing a certified statement with the Commissioner is a prerequisite to effectuating the cancellation of coverage. In light of the clarity of that part of the statute, CRIB lacked the authority to relieve the insurers of their obligation to comply with the requirement for filing a certification. Although CRIB could, consistent with its legislative mandate, create an alternate mechanism by which insurers could comply with the statute, it could not adopt a protocol that operated to allow the cancellation of coverage without submission by the insurers of some version of the statutorily required certification. In short, the Appellate Division correctly concluded that the use of the FTP system to transmit data about policy cancellations, without any accompanying certification, cannot be effective in light of the clear and unambiguous demands of *N.J.S.A.* 34:15–81(b).

Regarding substantial compliance, although we might not have parsed the elements of the doctrine exactly as the Appellate

Division did, we too have concluded that this is not a case that satisfies the policies that inform the substantial compliance doctrine. Here, the Legislature did not simply require notice to the Commissioner but also commanded that the insurer provide a certification by an employee attesting to the truthfulness of the fact that proper notice was afforded the insured. Although the legislative history of the Act is sparse, it seems obvious that the purpose of that provision was to place personal responsibility on an employee of the insurer to assure that proper notice. of cancellation was given and to require that employee to certify to that fact, recognizing the legal implications of a false certification. The electronic provision of information to the Commissioner, without a certification, completely defeats the notion of personal responsibility that the certification provision was intended to secure. It was, thus, not simply a technical misstep. As such, the insurer could derive no comfort from a substantial compliance analysis which is meant to ameliorate the harsh consequences of actions that meet the spirit of a law but technically fall short.

To be sure, the industry acted in good faith in its approach to the issue in reliance on CRIB's, at best, confusing advice. Nevertheless, the fact remains, as the Appellate Division pointed out, that the clear requirements of *N.J.S.A.* 34:15–81 were not satisfied, nor was substantial compliance effectuated.

NJM and the amici argue that such a decision constitutes a new rule of law which should be applied prospectively. We disagree. In ruling, we have merely confirmed the meaning of a clear statute. Thus, there is no warrant for a retroactivity analysis. *State v. Burstein,* 85 *N.J.* 394, 403, 427 *A.2d* 525 (1981) (holding retroactivity analysis relevant only in cases involving departure from existing law). Where a ruling is not a break from the past, we construe it as "one that has always applied." *State v. Colbert,* 190 *N.J.* 14, 22, 918 *A.2d* 14 (2007).

Nevertheless, we are concerned over the amici's argument that the practical effect of invalidating all prior cancellations with respect to which notice was electronically afforded would be to

create chaos in the workers' compensation insurance industry. Although the magnetic tape option allowed by CRIB does permit transmission of certifications as the statute requires, many insurers have been relying on the FTP system and therefore have not complied with that part of the statute at all.[3] The decision that the FTP system has been ineffective to achieve cancellation thus will cast doubt on thousands of policy cancellations in spite of the fact that they were never challenged. Had those cancellations been challenged in a timely fashion, the insurer might have been able to reconstruct the records and provide an employee's certification. Whether that would be possible now seems problematic. That is an untenable state of affairs. Thus, we have concluded that Sroczynski and any other party who previously raised the notice issue should be granted relief from the improper cancellations but that those cancellations that were never challenged should stand because the policyholders waived their right to do so.

That outcome is not perfect, but it rewards those who pursued their legal options; leaves those who waived a challenge with the results of their waiver; and does not throw into chaos an industry that adopted a mistaken plan of action in good faith reliance on official misinformation.

With respect to counsel fees, we affirm regarding the award to Sroczynski. We find no basis on which to conclude that the Appellate Division abused its discretion in its grant of fees to Sroczynski or in the quantum thereof. *See R.* 2:11–4(a) (incorporating statutory bases for award at trial level, *R.* 4:42–9(a) thus encompassing *N.J.S.A.* 34:15–64).

---

[3] We note that on October 9, 2006, after the filing of this litigation and likely because of it, CRIB issued Advisory Bulletin # 16 which alerted carriers that "a question exists" regarding whether cancellation notices submitted by magnetic tape and FTP satisfy the requirements of *N.J.S.A.* 34:15–81(b). Advisory Bulletin # 16 recommended that electronic filing of cancellation notices be accompanied by a transmittal letter containing a certification, in prescribed language, which includes the "like notice" statement required by the statute and previously included in Form 116–B.

We reach a different conclusion in respect of the Appellate Division's award of counsel fees to the UEF. Our analysis of *R.* 2:11–4(b) reveals no ground on which to sustain such an award on an appeal. Although broad in its description of workers' compensation appeals, the rule suggests that the award of fees is intended for the benefit of the injured worker and thus provides no ground for an award in favor of UEF. *See R.* 2:11–4(b).

Nor do we find authority in the more general subpart of the *Rule* which refers to "actions in which an award of counsel fees is permitted by *R.* 4:42–9(a)." *R.* 2:11–4(a). That *Rule,* which allows an award of fees to a successful claimant in actions based on indemnity or liability insurance policies, *see R.* 4:42–9(a)(6), has no application because the Fund does not qualify as such a successful claimant. *See Messec v. USF & G Ins. Co.,* 369 *N.J.Super.* 61, 64, 848 *A.*2d 36 (App.Div.2004) ("Fees should not be awarded [under *Rule* 4:42–9(a)(6) ] when an insurer loses a dispute with another insurer. . . .").

The only other potentially applicable rule refers to statutes that specifically allow counsel fees, *see R.* 4:42–9(a)(8). However, there is neither a basis for such an award in the UEF statute (*N.J.S.A.* 34:15–120.1 to –120.30) nor in the workers' compensation statute (*N.J.S.A.* 34:15–64). Lacking a basis in law, we reverse the award of counsel fees to the UEF.

The judgment of the Appellate Division in favor of Sroczynski is affirmed and the award of counsel fees to the UEF is reversed, for the reasons to which we have adverted.

Justice RIVERA–SOTO, concurring in part and dissenting in part.

On February 28, 2004, Walter Sroczynski was injured while in the employ of John Milek, t/a John Milek Construction (Milek). Two and one-half weeks later, Sroczynski filed a workers' compensation claim against his employer. Then unknown to Sroczynski, his employer's workers' compensation insurance had been cancelled almost six months earlier by New Jersey Manufacturers

Insurance Company (NJM), his employer's workers' compensation insurance carrier, for non-payment of premiums. In doing so, the workers' compensation insurance carrier sent a timely certified mail notice of cancellation to its insured—Sroczynski's employer—and, in accordance with the then-obtaining protocols, also sent an electronic notice of cancellation to the New Jersey Commissioner of Banking and Insurance.

In this appeal, Sroczynski—who was a stranger to the transactions between his employer and its workers' compensation insurance carrier as well as the transactions between that insurance carrier and its State regulators—acknowledges that the electronic notice of cancellation issued by the workers' compensation insurance carrier satisfied the notice transmission requirements promulgated by the New Jersey Compensation Rating and Inspection Bureau (CRIB). Sroczynski contends, however, that the electronic notice of cancellation issued by the insurance carrier did not satisfy statutory requirements and, hence, was ineffective. Thus, he claims that he is entitled to workers' compensation benefits that are greater than what he has received as an uninsured worker from the State's Uninsured Employer's Fund (Fund).

The governing statute is clear: *N.J.S.A.* 34:15–81 requires that, in order to cancel a workers' compensation insurance policy, the carrier must (1) provide its insured—the covered employer—"[a]t least ten days' notice in writing of the election to terminate such contract ... by registered mail" *and* (2) file a "like notice" with the Commissioner of Banking and Insurance, "together with a certified statement that the [statutorily required registered mail] notice [to its insured] has been given[.]" The majority concludes that "[t]he language of *N.J.S.A.* 34:15–81 is clear and unambiguous, allowing for no interpretation other than that filing a certified statement with the Commissioner is a prerequisite to effectuating the cancellation of coverage." *Ante* at 43, 961 *A.*2d at 701. That conclusion is unassailable and, to the extent the majority so holds, I concur.

The majority likewise holds that "[i]n light of the clarity of that part of the statute, CRIB lacked the authority to relieve the insurers of their obligation to comply with the requirement for filing a certification." *Ibid.* With that conclusion, I also agree. The majority further reasons that "[a]lthough CRIB could, consistent with its legislative mandate, create an alternate mechanism by which insurers could comply with the statute, it could not adopt a protocol that operated to allow the cancellation of coverage without submission by the insurers of some version of the statutorily required certification." *Ibid.* Again, I agree. Finally, the majority concludes that "the use of the FTP system to transmit data about policy cancellations, without any accompanying certification, cannot be effective in light of the clear and unambiguous demands of *N.J.S.A.* 34:15-81(b)." *Ibid.* Once again, I concur.[1]

I must part company with the majority in two fundamental but related respects: its rejection of the application of the doctrine of substantial compliance in these circumstances, as well as in its unexplained embrace of the doctrine of waiver to conclude that "Sroczynski and any other party who previously raised the notice issue should be granted relief from the improper cancellations but that those cancellations that were never challenged should stand because the policyholders waived their right to do so." *Id.* at 45,

---

[1] The majority also concludes that the award of counsel fees to Sroczynski was proper, but that the award of counsel fees to the Fund was not. *Ante* at 45–46, 961 *A.*2d at 710. Because the policy of workers' compensation insurance under which Sroczynski seeks benefits properly and effectively was cancelled, no award of counsel fees should flow to him. It cannot be disputed that " 'New Jersey has a strong public policy against the shifting of costs' and that '[t]his Court has embraced that policy by adopting the "American Rule," which prohibits recovery of counsel fees by the prevailing party against the losing party.' " *In re Estate of Vayda,* 184 *N.J.* 115, 120, 875 *A.*2d 925 (2005) (quoting *In re Niles,* 176 *N.J.* 282, 293–94, 823 *A.*2d 1 (2003) (citations omitted)). *N.J.S.A.* 34:15-64(a) only allows an award of counsel fees "to the party in whose favor judgment is entered[.]" In this case, there simply is no basis here for an award of counsel fees to Sroczynski.

To the extent the majority concludes that there was no basis for an award of counsel fees to the Fund—and thereby reverses that award—I concur with its reasoning and result.

961 *A*.2d at 710. In my view, this case presents a textbook set of circumstances that cry out for the application of the doctrine of substantial compliance. In these unique circumstances, driven in large measure, by the acts of the statutorily created entity responsible for compliance with the statute itself, the workers' compensation carrier substantially complied with the admittedly clear and unambiguous statutory requirements for the cancellation of a workers' compensation insurance policy. Hence, the almost six-months' earlier cancellation of the policy at issue here for the non-payment of premiums was effective, requiring that the judgment of the Appellate Division be reversed and that judgment be entered in favor of the workers' compensation insurance carrier. Therefore, I respectfully dissent.

## I.

Much of the majority's analysis is driven by the abbreviated statement of facts on which it relies. Because a more robust exposition of the facts leads to a better informed view of the issues joined, I present those facts—which are not disputed—in greater detail.

## A.

At all times relevant to the issues in this appeal, Sroczynski was employed by Milek. NJM, through one of its subsidiaries, issued a Workers' Compensation and Employers Liability Insurance policy to Milek with an effective policy period of May 6, 2003 to May 6, 2004. Milek paid the initial premium for the coverage, but failed to continue making the premium payments when due. On August 14, 2003, NJM sent Milek a notice of cancellation of the policy by certified mail. The next day, NJM used CRIB's electronic file transmission protocol—the FTP system—to transmit electronic notice of that cancellation, with an effective date of September 5, 2003, to the Commissioner.

Almost six months later, on February 28, 2004, Sroczynski sustained a work-related injury while employed by Milek. A few

weeks later, he filed a claim petition in the Division of Workers' Compensation, seeking benefits. NJM responded to that petition by moving to be relieved of responsibility for covering the claim. NJM asserted that the policy had been cancelled well before Sroczynski's injury and that it had complied with the statutory notice requirements by using the FTP system to notify the Commissioner of the cancellation. Sroczynski and the Fund opposed NJM's motion, as did intervenor Robert Wood Johnson University Hospital (the Hospital), where Sroczynski had undergone significant treatment for which the Hospital remained unpaid.

The Judge of Compensation convened a plenary hearing to consider the arguments being advanced. The only witness was an assistant vice president of NJM who testified about the reason for the cancellation of the policy, explained the manner in which Milek was notified, and described the FTP system through which NJM filed its notice of the cancellation with the Commissioner. The Judge of Compensation concluded that the use of the FTP system to transmit the policy cancellation data did not suffice to meet the statute's command that the carrier submit a "certified statement" that notice had been given to the employer as a prerequisite for cancellation. He therefore concluded that NJM had not cancelled the policy and, thus, denied NJM's motion to be relieved of any obligations on the claim.

The Appellate Division granted NJM's motion for leave to appeal and, in a published opinion, affirmed. *Sroczynski v. Milek*, 396 *N.J.Super.* 248, 933 *A.*2d 931 (App.Div.2007). It rejected both NJM's argument that actual notice of cancellation to Milek met the statute's essential purposes, *id.* at 255, 933 *A.*2d 931, and NJM's alternate contention that it should have the benefit of the doctrine of substantial compliance, *id.* at 257–59, 933 *A.*2d 931. Thereafter, the panel granted separate motions filed by Sroczynski and the Fund seeking attorneys' fees.

This Court granted NJM's motion for leave to appeal from the judgment and the award of attorneys' fees to Sroczynski, 192 *N.J.*

591, 934 *A.*2d 635 (2007), and we granted leave to the Property Casualty Insurers Association of America and the Insurance Council of New Jersey to participate as amici curiae. We thereafter granted NJM's second motion for leave to appeal the award of attorneys' fees to the Fund, 193 *N.J.* 272, 937 *A.*2d 975 (2007), as well as NJM's additional motion for leave to supplement the record with materials relating to the way in which the FTP system operates.

### B.

In 1917, New Jersey adopted its Workers' Compensation Act. *L.* 1917, *c.* 178. That legislative enactment included a mechanism to cancel a workers' compensation insurance policy: it required that the workers' compensation carrier file a notice of cancellation with the Commissioner of Insurance *and* serve it on the employer by hand-delivery or registered mail. *Id.* at Art. I, § 7. In 1937, the Workers' Compensation Act was amended to eliminate the option of delivery to the employer—thus requiring written notice only by registered mail—and to add the requirement at issue in this appeal: that the insurance carrier seeking to cancel workers' compensation coverage also file a certified statement of compliance with the statutory provision regulating the manner of providing notice of the cancellation to the employer. *L.* 1937, *c.* 134, § 1.

Two other provisions of the 1917 Act are relevant to our analysis. First, the 1917 Act included a section that created CRIB, it defined the role CRIB was to play, and set forth the general subjects on which CRIB was to focus its efforts. *N.J.S.A.* 34:15–89 (codifying *L.* 1917, *c.* 178, Art. II, § 1). Second, it required all insurers to become CRIB members in order to remain authorized to issue workers' compensation coverage. *N.J.S.A.* 34:15–90 (codifying *L.* 1917, *c.* 178, Art. II, § 2).

### C.

CRIB publishes the New Jersey Workers' Compensation and Employers' Liability Insurance Manual (the Manual), which de-

scribes the rules and regulations with which every workers' compensation carrier in New Jersey must comply. The Manual expresses the general concept that compliance with its provisions does not relieve workers' compensation carriers of their obligations to comply with the statute. In particular, Part 1, Section 1 of the Manual, titled "Promulgation and Approval of the Manual," includes a section called "Statutes Read In." That section purports to incorporate by reference all of the relevant statutes, thus making their requirements a part of the Manual itself.

However, the Manual also includes an Approved Form for Filing Notice of Cancellation by Carrier, known as "Form 116–B." The version of Form 116–B approved for use by carriers when providing the statutory notice of cancellation during the time period relevant to this matter incorporates a certification by the carrier that "like notice of election to terminate the stated contract of insurance has been given the employer in accordance with [the] requirement[s] of [*N.J.S.A.*] 34:15–81." [2]

In addition to Form 116–B, at all times relevant to this appeal, CRIB authorized carriers to submit cancellation notices by means of electronic transmission. Electronic submission of cancellation information could be made in either of two ways. First, the insurer could comply with its requirement of submitting cancellation notices in the form of a magnetic tape, as long as that tape included the data prescribed in the National Workers Compensation Data Specifications Manual. Second, the Manual provides that "[i]t is also permissible to submit cancellation notices via Electronic File Protocol[,]" or CRIB's FTP system.[3] That system

---

[2] That language seemingly inverts the rather plain statutory requirement that the certification that "like notice" was given is addressed to the State, and *not* to the employer/insured. In proper order, the carrier's primary duty of notice is to the employer; then and only then is a "like notice" to be given to the State, along with a certification of service.

[3] The FTP system is not proprietary to CRIB, but instead was devised by a national workers' compensation organization for use in many other jurisdictions. In adopting it, CRIB essentially followed the lead of that national organization,

is structured to permit only the transfer of data, allowing the insurer to submit information that identifies the specific policy it intends to cancel, the date when a cancellation notice was sent, and the reason for the cancellation. CRIB's FTP system, however, cannot accomplish the transmission of documents, including either a completed Form 116–B or a separate certification.

In its 2005 Annual Report, however, CRIB expressed its preference for having insurers use electronic and magnetic tape transmissions, explaining:

> Carriers are also encouraged to use policy and statistical electronic and magnetic tape filing methods. The flow of hard copy submissions increases expense costs for the sender and the recipient. Electronic and magnetic tape reporting, on the other hand, improves the timeliness of data submission and, at the same time, enhances the credibility and quality of the data being submitted. Standard national WCIO [Workers Compensation Insurance Organizations] data reporting specifications (WCPOLS [Workers Compensation Policy Reporting Specifications] and WCSTAT [Workers Compensation Statistical Reporting Specifications] ) are in place and we are committed to assist any carrier to reduce and eliminate hard copy filings.

On October 9, 2006, after the filing of the complaint in this litigation challenging the adequacy of the FTP system to effectuate a cancellation of a policy, CRIB issued Advisory Bulletin # 16. That Bulletin alerted the workers' compensation carriers that "a question exists" regarding whether cancellation notices submitted by magnetic tape and FTP satisfy the requirements of *N.J.S.A.* 34:15–81(b). Advisory Bulletin # 16 recommended that electronic filing of cancellation notices be accompanied by a transmittal letter

---

electing to join in a national effort to streamline filing processes and reduce the flow of paperwork. However, New Jersey's added certification requirement is unusual. In other states, workers' compensation carriers are able to effectuate a cancellation without filing a certification of the type that our statute requires. *See, e.g., N.Y. Workers' Comp. Law* § 54(5) (no certification requirement); *Mass. Gen. Laws* ch. 152, § 63 (same); Cal. Ins.Code § 676.8(c) (same); *Fla. Stat.* § 440.185(7) (same). As a result, in those jurisdictions, the need to create a cancellation mechanism that would accommodate a separately filed certification did not arise. Rather, in those other jurisdictions, transmitting the data that identifies the policy being cancelled, provides the date of cancellation and explains the reason for cancellation, is sufficient to effect that cancellation. That being the case, the FTP system, which is merely a data transmission protocol, would suffice in those other jurisdictions, but is deficient here.

containing a certification, in prescribed language, which included the "like notice" statement required by the statute and presumably previously included in Form 116–B.

## D.

There is no doubt about what the statute requires for effective cancellation of a policy. Similarly, there is no doubt about the sufficiency of Form 116–B for this purpose. At the heart of this dispute is whether complying with CRIB's preferred method of transmission of data, through the use of the FTP system, without jointly or separately submitting Form 116–B or a similar writing, satisfies or substantially complies with the statute's command that a certified statement be filed with the Commissioner. It is to that question that I now turn.

## II.

The governing statute, *N.J.S.A.* 34:15–81, sets forth the specific requirements for cancellation of a workers' compensation policy of insurance. It provides, in full, that

[a]ny contract of insurance issued by a stock company or mutual association against liability arising under this chapter may be canceled by either the employer or the insurance carrier within the time limited by such contract for its expiration. No such policy shall be deemed to be canceled until:

a. At least ten days' notice in writing of the election to terminate such contract is given by registered mail by the party seeking cancellation thereof to the other party thereto; and

b. Until like notice shall be filed in the office of the commissioner of banking and insurance, *together with a certified statement that the notice provided for by paragraph "a" of this section has been given;* and

c. Until ten days have elapsed after the filing required by paragraph "b" of this section has been made.

The provisions "b" and "c" of this section shall not apply where the employer has replaced the contract to be canceled by other insurance, and notice of such replacement has been filed with the Commissioner of Banking and Insurance. In such event the notice required by provision "a" may, if given by the insurance carrier, recite as the termination date the effective date of the other insurance, and the contract shall be terminated retroactively as of that date. No notice of cancellation of any such contract need be filed in the office of the Commissioner of

Banking and Insurance where the employer is not required by any law of this State to effect such insurance.

[*N.J.S.A.* 34:15–81 (emphasis supplied).]

Stated plainly, this statute requires two steps in order to validly and effectively cancel a workers' compensation insurance policy: the carrier must give the employer written notice of the proposed cancellation by a prescribed means, *and* the carrier also must file with the Commissioner both "like notice" and a certified statement that the employer has been notified as required. *Ibid.*

## A.

CRIB has been designated by the Legislature to promulgate the rules and regulations that will fulfill the statute's requirements. *N.J.S.A.* 34:15–89 (providing that CRIB "shall establish and maintain rules, regulations and premium rates for workmen's compensation and employer's liability insurance"); *N.J.S.A.* 34:15–90 (providing that CRIB "shall adopt such rules and regulations for its procedure and provide such income as may be necessary for its maintenance and operation"). While great deference is generally afforded to the actions of administrative agencies in exercising their rulemaking functions, *see, e.g., In re Freshwater Wetlands Prot. Act Rules,* 180 *N.J.* 478, 489, 852 *A.*2d 1083 (2004); *In re Rulemaking, N.J.A.C. 10:82–1.2 & 10:85–4.1,* 117 *N.J.* 311, 325, 566 *A.*2d 1154 (1989), CRIB's status does not necessarily entitle it to that deferential standard of review.

CRIB is not, strictly speaking, an administrative agency, operating instead more in the nature of an extended arm of the insurance industry. *See Aetna Ins. Co. v. Trans Am. Trucking Serv., Inc.,* 261 *N.J.Super.* 316, 320 n. 4, 618 *A.*2d 906 (App.Div.1993). For example, although the Legislature has given CRIB the authority to establish rules and regulations governing workers' compensation insurance, *N.J.S.A.* 34:15–89, those rules are not adopted in conformity with the New Jersey Administrative Procedure Act. *See N.J.S.A.* 52:14B–1 to –25 (setting forth scheme for regulatory rule-making). Further, once adopted, CRIB's rules are not published in New Jersey's Administrative Code, but

instead are set forth in the Manual. *See, e.g., N.J.S.A.* 52:14B–7 (requiring that Director and Chief Administrative Law Judge of the Office of Administrative Law "shall compile, index and publish a publication to be known as the 'New Jersey Administrative Code,' containing all effective rules adopted by each agency"). Moreover, although CRIB falls generally under the supervision of the Commissioner, through its appointed chairman, CRIB member insurance companies are responsible for selecting the organization's officers, committee members, and employees. *N.J.S.A.* 34:15–90.

There exists an inherent tension between CRIB's performance of its functions as an administrative agency and its role in protecting the interests of its members. As a result, a review that is more searching than the deferential one usually employed in administrative agency appeals is appropriate. At the same time, because the facts are not in dispute and because the questions presented are purely legal in nature, no deference is owed to the reasoning or conclusions of the Judge of Compensation; review of that decision is de novo. *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan,* 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995). With these standards as our guide, I consider the issues presented.

### B.

I concur with the majority's determination that the statute's language is clear and unambiguous, allowing for no interpretation other than that a filed certified statement is a prerequisite to an effective cancellation of coverage.

Next, in light of the clarity of that part of the statute, CRIB lacked the authority to relieve wholesale the insurers of their obligation to comply with the requirement for filing a certification. This is so because, although we place great weight on "the interpretation of the agency charged with enforcing an act," *In re N.J. Tpk. Auth. v. Am. Fed'n of State, County, & Mun. Employees, Council 73,* 150 *N.J.* 331, 351, 696 *A.*2d 585 (1997) (quoting *Merin v. Maglaki,* 126 *N.J.* 430, 436–37, 599 *A.*2d 1256 (1992)), we

afford no such deference if the "agency's statutory interpretation is contrary to the statutory language, or if the agency's interpretation undermines the Legislature's intent[.]" *Ibid.; see also In re Adoption of N.J.A.C. 7:26B,* 128 *N.J.* 442, 450, 608 *A.*2d 288 (1992) ("Our deference does not go so far as to permit an administrative agency under the guise of an administrative interpretation to give a statute any greater effect than is permitted by the statutory language."). Although CRIB, consistent with its legislative mandate, could have created an alternate mechanism by which insurers could comply with the statute, it was not free to adopt a protocol that operated to cancel coverage without submission by the insurers of some version of the statutorily required certification.

That said, CRIB's expressed and reasonable preference for electronic filings inadvertently created an impression throughout the industry that use of the FTP methodology would be effective to cancel a policy without simultaneous submission of a separate, written certified statement.[4] Under New Jersey's statutory requirements, CRIB's preferred system fell short of what is demanded. However, in light of the impression CRIB clearly created—that compliance with the FTP transmission protocols would

---

[4] The conclusion that the impression of compliance by use of the FTP protocol created by CRIB was inadvertent derives from three sources: its Manual, its Advisory Bulletin # 16, and a critical examination of the source from which CRIB created and adopted the FTP system.

Although the Manual contains a cautionary statement to the effect that, notwithstanding any of its provisions, insurers are not relieved of their independent obligations to comply with all of the requirements of the statute, it nevertheless plainly states that "[i]t is permissible to submit cancellation notices via [the FTP protocol]." Advisory Bulletin # 16, which issued after this litigation was initiated, also suggests that the use of the FTP system, without the separate filing of a certification, would comply with the statute. Finally, as noted earlier, the FTP system was created by out-of-state regulatory agencies that do not share New Jersey's additional requirement that the carrier make a separate certification to CRIB of the electronically transmitted data. In the aggregate, these combine to produce the indelible but incorrect impression that a carrier's communication of its policy cancellations to CRIB via the FTP system sufficed for statutory compliance purposes.

equal compliance with the statutory requirements for policy cancellation—I must turn to whether NJM, relying on CRIB's instructions, substantially complied with the statute's requirements.

## C.

Relying on, but not discussing, the Appellate Division's analysis, the majority concludes that, in the circumstances presented, "substantial compliance [was not] effectuated." *Ante* at 44, 961 *A*.2d at 709. I disagree.

The lengthy history of the doctrine of substantial compliance need not be explored yet again; we recently described it as grounded in ancient English Common Law concepts. *See Galik v. Clara Maass Med. Ctr.*, 167 *N.J.* 341, 351, 771 *A*.2d 1141 (2001). Rather, our focus remains on the essential purpose of the doctrine: "to avoid the harsh consequences that flow from technically inadequate actions that nonetheless meet a statute's underlying purpose." *Id.* at 352, 771 *A*.2d 1141. In general, resort to this doctrine has been had in order to permit relief from technical requirements "in a wide array of contexts." *Id.* at 352–53, 771 *A*.2d 1141. (citing examples). Although the doctrine most often has been invoked in order to permit putative plaintiffs to avoid the consequence of statutes of limitation or other filing requirements, the fundamental purpose of this doctrine does not preclude its application in favor of NJM.

The application of the substantial compliance doctrine employs a two-part approach. *See Galik, supra,* 167 *N.J.* at 354–55, 771 *A*.2d 1141. First, the relevant statute and its legislative history are reviewed to determine "whether there is a legislative intent to preclude a substantial compliance analysis." *Ibid.* Second, five traditional criteria of the doctrine are evaluated. *See Galik, supra,* 167 *N.J.* at 353, 771 *A*.2d 1141. As originally articulated in *Bernstein v. Board of Trustees of the Teachers' Pension and Annuity Fund,* 151 *N.J.Super.* 71, 76–77, 376 *A*.2d 563 (App.Div. 1977), those criteria are:

(1) the lack of prejudice to the defending party; (2) a series of steps taken to comply with the statute involved; (3) a general compliance with the purpose of the statute; (4) a reasonable notice of petitioner's claim, and (5) a reasonable explanation why there was not a strict compliance with the statute.

That evaluation is not performed in a vacuum, as the five criteria must be considered in light of our recognition of the role played by the substantial compliance doctrine in preventing "technical defects [from] defeat[ing] a valid claim." *Ferreira v. Rancocas Orthopedic Assocs.,* 178 *N.J.* 144, 151, 836 *A.*2d 779 (2003) (citing *Cornblatt v. Barow,* 153 *N.J.* 218, 239, 708 *A.*2d 401 (1998)).

A fair and balanced application of the *Galik* two-part analysis leads to the conclusion that the appellate panel erred when it concluded that the first and fifth criterion had not been met and, thus, concluded that the doctrine of substantial compliance did not apply in these circumstances. In respect of the first part of the *Galik* analysis, I discern no intent in the statute that would preclude its application. Although the language of the statutory command that a certified statement be filed is clear, no legislative history sheds light on the reason for that requirement. More to the point, no legislative history suggests that the policy underlying this aspect of the statute precludes resort to a substantial compliance rationale. It is telling that, at the time that the certification requirement was added, the option of personal delivery of the cancellation notice to the affected employer was deleted. *L.* 1937, c. 134, § 1. That legislative exchange of one obligation for another leads to the conclusion that the requirement of a written certification of mailing was intended as a delivery substitute, to ensure that no policy providing benefits to injured workers would be cancelled unless notice of that cancellation likely had been received and sufficient time had elapsed to allow an employer either to cure the default that led to the cancellation or to secure replacement coverage. In that context, evidence of actual delivery or receipt seemingly satisfies the statute's essential purpose just as well as filing a statement attesting to mailing. No doubt, the Legislature did not intend to foster a disregard of the statutory prerequisite that a certified statement be filed before cancellation

can be effective. Nonetheless, there is no basis to conclude that the Legislature further intended to preclude application of the doctrine of substantial compliance in an appropriate case.

In respect of the second part of the *Galik* analysis, NJM in fact has satisfied the traditional elements of the doctrine. Rejecting NJM's substantial compliance argument, the Appellate Division focused on two of the doctrine's five traditionally recognized criteria: according to the panel, NJM could not satisfy the criteria that there was a lack of prejudice to the defending party (the first criterion) or that it had a reasonable explanation for its failure to comply (the fifth criterion). *Sroczynski, supra,* 396 *N.J.Super.* at 258–59, 933 *A.*2d 931. Again, I disagree.

The awkward factual setting of this case renders whether there is a lack of prejudice to the defending party an admittedly close question. Typically, the doctrine of substantial compliance has been invoked in favor of plaintiffs seeking relief from a statute of limitations or similar rule. *See, e.g., Fink v. Thompson,* 167 *N.J.* 551, 564, 772 *A.*2d 386 (2001) (finding substantial compliance where timely-served affidavit and expert's report clearly focused on conduct of defendant doctor, even though both documents failed to name him); *Negron v. Llarena,* 156 *N.J.* 296, 305, 716 *A.*2d 1158 (1998) (finding substantial compliance for widow's wrongful death claim after her initial federal suit was dismissed for lack of subject matter jurisdiction). In other instances, it has been used to assess whether an apparently meritorious claim should be prevented from proceeding. *See Palanque v. Lambert–Woolley,* 168 *N.J.* 398, 405, 774 *A.*2d 501 (2001) (finding no substantial compliance where plaintiff had expert report before initiating suit, but failed to provide defendant with the report or an affidavit of merit within 120 days after filing of answer). In those cases, it was the injured party seeking flexibility, and considering prejudice to the defending party in that context calls to mind core policy considerations about fault and responsibility, and rests on basic notions of which party should bear any given loss. As a result, the balance is often struck in favor of allowing

an injured party to have his or her day in court, rather than being met with a closed courthouse door.

This record, however, presents circumstances unlike traditional ones, for here the insurer, seeking to avoid responsibility under its policy in spite of its failure to comply strictly with the statute's demands, invokes the benefit of the doctrine. The question, then, is how to interpret the doctrine's first criterion—lack of prejudice to the defending party—in that context. Certainly, if the "defending party" to be considered is Milek, there is no prejudice: the record clearly reflects that Milek received notice of the cancellation and did not effect a cure. But just as certainly, if the appropriate "defending party" is the injured worker, there will be prejudice because the recovery he can achieve from the Fund is not co-extensive with the benefits he would enjoy under the NJM policy. *See N.J.S.A.* 34:15–120.2 (providing that Fund pays only for medical expenses and temporary benefits, but not permanent disability benefits).

Although the practical effect of this conclusion is obvious, direct and, regrettably, unfortunate, an injured worker who at most is a third-party beneficiary under a policy of insurance cannot constitute the "defending party" for purposes of analyzing the application of the substantial compliance doctrine; that designation belongs to the employer whose insurance policy was cancelled and who, therefore, stands solely liable for his employees' workers' compensation claims. If that is so, then there is no prejudice to the "defending party," requiring that the balance be struck in NJM's favor.

In respect of the fifth criterion, NJM also had a reasonable explanation for its failure to comply strictly with the requirements of *N.J.S.A.* 34:15–81(b). Notwithstanding the clear directive in the statute, it cannot be said that it was unreasonable for NJM to rely on the FTP system adopted by CRIB for the purpose of streamlining submission of cancellation data and, by the same token, for it to believe that use of the FTP system alone would suffice. Although hindsight may reveal that decision as ill-ad-

vised, under the circumstances presented it was not so unreasonable a course of action as to reject the application of the doctrine of substantial compliance. In particular, CRIB's expression of its preference for use of the FTP system, in light of CRIB's statutory role, gave rise to NJM's reasonable conclusion that compliance with the requested methodology would suffice for statutory compliance purposes. In somewhat analogous circumstances, an entity's reliance on a governmental agency's advice or determination can be reasonable for purposes of equitable estoppel. *See Skulski v. Nolan*, 68 *N.J.* 179, 198, 343 *A.*2d 721 (1975) (remanding for determination about applicability of equitable estoppel in light of unique considerations relating to reliance); *cf. Aqua Beach Condo. Assn. v. Dep't of Community Affairs*, 186 *N.J.* 5, 20, 890 *A.*2d 922 (2006) (recognizing potential for equitable estoppel to operate against public agency, but rejecting its application based on absence of either manifest injustice or reasonable reliance).

In large part, the conclusion that NJM successfully may invoke the doctrine of substantial compliance in these circumstances rests on the persuasive and unrebutted proofs that NJM's misperception was not unique, but instead was widespread and was based on CRIB's inadvertent suggestion that use of the FTP system would suffice for statutory compliance purposes. However, it must be emphasized that, as a result of this litigation, it is beyond doubt that, prospectively, insurers may not rely simply on electronic data transmission methods to effect the cancellation of policies, but instead must insure that the necessary certification under *N.J.S.A.* 34:15–81(b) also is submitted in order to effect a valid cancellation of a workers' compensation insurance policy.

## IV.

Although the doctrine of substantial compliance suffices to cloak NJM's actions with statutory protection, I nevertheless must address a glaring logical inconsistency in the majority's reasoning.

In the majority's view—and one to which I subscribe—the provisions of *N.J.S.A.* 34:15–81 are crystal clear, simple and direct:

in order to effect a valid cancellation of a workers' compensation policy of insurance, the carrier must (1) send a minimum ten-day written notice to the insured by registered mail, and (2) provide a "like notice" to the Commissioner of Banking and Insurance together with a separate certification that the required notice to the insured has been given. To be sure, NJM failed to satisfy that last requirement, that is, that it certify to the Commissioner that the statutory notice to the insured in fact was given. I conclude that NJM should not be penalized by its failure because its actions were reasonable, excusable and consistent with regulatory direction, albeit a direction that was in error. That conclusion bars any recovery against NJM or any other workers' compensation insurance carrier that acted as and why NJM did, either by Sroczynski or anyone else similarly situated, and puts the matter to rest.

Seeking to avoid the parade of horribles presented by amici—that "the practical effect of invalidating all prior cancellations with respect to which notice was electronically afforded would be to create chaos in the workers' compensation industry[,]" *ante* at 44–45, 961 *A*.2d at 709—the majority concludes, without any discussion or analysis, that those who have not raised a workers' compensation carrier's non-compliance with the clear dictates of *N.J.S.A.* 34:15–81 have waived their claim. I can discern no principled basis for the invocation of the doctrine of waiver in these circumstances.

It hardly needs repeating that "[w]aiver is the voluntary and intentional relinquishment of a known right." *Knorr v. Smeal,* 178 *N.J.* 169, 177, 836 *A*.2d 794 (2003) (citing *W. Jersey Title & Guar. Co. v. Indus. Trust Co.,* 27 *N.J.* 144, 152, 141 *A*.2d 782 (1958)). *See also Shotmeyer v. N.J. Realty Title Ins. Co.,* 195 *N.J.* 72, 89, 948 *A*.2d 600 (2008). It is beyond question that "[a]n effective waiver requires a party to have full knowledge of his legal rights and inten[d] to surrender those rights." *Knorr, supra,* 178 *N.J.* at 177, 836 *A*.2d 794 (citing *W. Jersey Title & Guar. Co., supra,* 27 *N.J.* at 153, 141 *A*.2d 782). A waiver cannot

be divined but, instead, must be the product of objective proofs: "The intent to waive need not be stated expressly, provided the circumstances clearly show that the party knew of the right and then abandoned it, either by design or indifference." *Ibid.* (citing *Merchs. Indem. Corp. of N.Y. v. Eggleston*, 68 *N.J.Super.* 235, 254, 172 *A.2d* 206 (App.Div.1961), *aff'd*, 37 *N.J.* 114, 179 *A.2d* 505 (1962)). That benchmark standard leaves little room for doubt, as "[t]he party waiving a known right must do so clearly, unequivocally, and decisively." *Ibid.* (citing *Country Chevrolet, Inc. v. Twp. of N. Brunswick Planning Bd.*, 190 *N.J.Super.* 376, 380, 463 *A.2d* 960 (App.Div.1983)). *See also Shotmeyer, supra*, 195 *N.J.* at 89, 948 *A.2d* 600 (quoting *Knorr, supra*). Specifically, "waiver 'presupposes a full knowledge of the right and an intentional surrender; waiver cannot be predicated on consent given under a mistake of fact.'" *County of Morris v. Fauver*, 153 *N.J.* 80, 104–05, 707 *A.2d* 958 (1998) (quoting *W. Jersey Title & Guar. Co., supra*, 27 *N.J.* at 153, 141 *A.2d* 782).

This record on appeal is absolutely barren of any proofs whatsoever concerning any workers' compensation claimant other than Sroczynski. Thus, there simply is no basis for the majority's conclusion that workers' compensation claimants who knew nothing of whether their employers' cancelled insurance policies were in fact cancelled in strict accordance with *N.J.S.A.* 34:15–81 voluntarily and intentionally relinquished their known rights. Without proof of that knowledge, coupled with either stated or implied action or inaction on the part of the claimant, the conclusion that those same claimants somehow waived their rights under the improperly cancelled policies is unmoored to reality, reason, law or equity.

To repeat yet again, a workers' compensation carrier's obligation to comply with *N.J.S.A.* 34:15–81 in order to effect a valid cancellation is clear and unambiguous. If the carrier fails to abide by that statute's dictates, two and only two alternatives remain: either the carrier is deemed to have substantially complied with the statute and, hence, is liable to none; or the carrier did not

substantially comply with the statute and, thus, is liable to all. The hybrid relief cobbled together by the majority—whereby "Sroczynski and any other party who previously raised the notice issue should be granted relief from the improper cancellations but that those cancellations that were never challenged should stand because the policyholders waived their right to do so[,]" *ante* at 44–45, 961 *A.*2d at 709–10—is logically and rationally untenable.

## V.

Because I conclude that NJM substantially complied with the requirements of *N.J.S.A.* 34:15–81, I similarly conclude that all of its policy cancellations were effective and, hence, it bears no liability thereunder. Thus, in my view, the correct result here is that the judgment of the Appellate Division should be reversed and the cause remanded to the Division of Workers' Compensation for the entry of judgment in favor of NJM and dismissing Sroczynski's petition. Because the majority reaches a different result on an unsustainable basis, I respectfully dissent.

Justice HOENS joins in this opinion.

*For affirmance in part/reversal in part*—Chief Justice RABNER and Justices LONG, ALBIN, and WALLACE—4.

*For concurrence in part; dissent in part*—Justices RIVERA-SOTO, and HOENS—2.