**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4020-19

JINWON BYUN a/k/a JACKIE
BYUN and ESTATE OF JACKIE
BYUN, by her mother and natural
guardian, MYONG AE BYUN,
MYONG AE BYUN, and
CHONG WON BYUN,

     Plaintiffs-Appellants,

v.

ENGLEWOOD HOSPITAL
AND MEDICAL CENTER,
HEE JUNG PARK, MD,
AJAY JETLEY, MD,
JEAN READIE, MD, and
JOHN VOGT, RN,

     Defendants-Respondents,

and

RACHNA SUBRAMONY, MD,

     Defendant.

_____

Argued June 8, 2022 – Decided September 2, 2022

Before Judges Gilson, Gooden Brown and Gummer.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-3026-18.

Michael S. Kimm argued the cause for appellants (Kimm Law Firm, attorneys; Michael S. Kimm and Jonathan Lugo, on the briefs).

John R. Scott argued the cause for respondents Englewood Hospital and Medical Center and Ajay Jetley, MD (Clare & Scott, LLC, attorneys; John R. Scott, of counsel and on the briefs).[1]

Anthony A. Lenza, Jr., argued the cause for respondent Hee Jung Park, MD (Amabile & Erman, PC, attorneys; Anthony A. Lenza, Jr., of counsel and on the briefs).

Douglas F. Ciolek argued the cause for respondent Jean Readie, MD (Rosenberg Jacobs Heller & Fleming, PC, attorneys; Lawrence H. Jacobs, of counsel; Douglas F. Ciolek, on the briefs).

Haley K. Grieco argued the cause for respondent John Vogt, RN (Mattia, McBride & Grieco, PC, attorneys; Philip F. Mattia, of counsel; Haley K. Grieco, on the briefs).

PER CURIAM

---

[1] We note plaintiffs identified the hospital defendant as "Englewood Hospital" and the hospital in its submissions uses the name "Englewood Hospital and Medical Center." We also note that plaintiffs' spelling of some of the doctors' names differs from the doctors' spelling. For the sake of accuracy, we use the doctors' spelling.

A-4020-19

In this medical-negligence case, plaintiffs appeal orders barring certain expert opinions or testimony, granting defendants' summary-judgment motions, and denying plaintiffs' motions to amend the complaint, to supplement plaintiffs' expert reports, and for reconsideration of the expert-testimony orders. Perceiving no error or abuse of discretion, we affirm.

Except for limited circumstances not applicable here, an expert opinion is necessary to establish fundamental elements of a medical-negligence case. The expert opinion must be made by someone qualified to render it and must set forth the applicable standard of care, the ways in which the medical professional failed to meet that standard of care, and how that deviation from the standard of care harmed the patient. Without that expert opinion, a plaintiff has failed to make a prima facie case of medical negligence. Despite repeated opportunities, plaintiffs failed to meet that burden and the trial court ultimately and correctly granted defendants' summary-judgment motions.

I.

We discern the facts from the summary-judgment record, viewing them in the light most favorable to plaintiffs. See Richter v. Oakland Bd. of Educ., 246 N.J. 507, 515 (2021).

A-4020-19

On May 12, 2016, plaintiff Myong Ae Byun took her daughter, decedent Jinwon Byun (also known as Jackie), to the emergency department of Englewood Hospital.[2] Jackie was a twenty-five-year-old woman with autism, a limited ability to communicate verbally, and a history of seizures. Earlier that day, Jackie's neurologist recommended Myong take Jackie, who had not been eating for two or three days, to her regular internist or a hospital to determine if she was constipated, had a bladder or urinary-tract infection, or had pneumonia. At the hospital, Jackie was running a fever, was dehydrated, and had a severely-distended abdomen.

Defendant Dr. Hee Jung Park, an internal-medicine resident at the hospital, met with Myong and Jackie. Dr. Park and Myong spoke to each other in Korean. Dr. Park told Myong that Jackie needed a urine test and blood work. Myong signed a consent for treatment for Jackie, which included "any x-rays, laboratory, or other medical procedures . . . ." The blood work showed Jackie had an elevated white blood count.

Myong asked Dr. Park to give her a cup so she could take Jackie to the bathroom and collect a urine sample from her. Dr. Park declined her request,

---

[2] Because the decedent and her mother shared a surname, we use Jackie and Myong for ease of reading.

saying a tube had to be inserted to collect a clean sample. Myong told Dr. Park she would not be able to obtain a urine sample by a tube because Jackie would not understand the procedure and "probably wouldn't go for it." Hospital records indicate Dr. Park and defendant Dr. Ajay Jetley, a board-certified emergency-medicine physician, co-signed orders for a urinalysis and urine culture at 4:04 p.m. and for "Straight cath for UA, C&S" and "Straight Cath for Urine Specimen" at 5:05 p.m. Dr. Jetley and defendant Dr. Jean Readie, a board-certified emergency-medicine physician, were Dr. Park's direct supervisors in the emergency department that evening. In hospital records, Dr. Readie indicated she had "[r]eceived signoff from Dr. Jetley" at 5:30 p.m.

According to Myong, two nurses entered Jackie's room and told Myong to leave. Myong exited the room. According to defendant John Vogt, R.N., at 6:00 p.m. Jackie was "unable to tolerate[] straight cath for urine at th[at] point" and a decision was made to wait until Jackie could receive "IV [A]tivan."

When she re-entered the room, Myong noticed Jackie's face and lips were purple. Myong thought she might have had a seizure. Within fifteen to twenty minutes, Jackie calmed down and her color returned to normal. Jackie subsequently jumped off the bed and pulled an intravenous line (IV) out of her arm. A nurse told Myong the IV had to be reinserted. According to Myong, the

5

nurse and someone who looked like a guard lifted Jackie, placed her back in the bed, and "flattened her down, on all arms and legs, by force." Jackie turned blue and appeared to be having a seizure. Dr. Readie was called to Jackie's bedside with Dr. Park. After efforts to intubate Jackie were unsuccessful, an airway was created surgically. As Jackie was being transferred to an operating room "for further airway stabilization and surgical exploration," she "abruptly developed bradycardia and ventricular fibrillation." Advanced cardiac life support was performed on Jackie, but it was unsuccessful and she died.

On April 25, 2018, plaintiffs filed a complaint naming as defendants the hospital, Drs. Park, Jetley, Readie, and Rachna Subramony, Nurse Vogt, and fictitious defendants Kathy Doe and John Doe, respectively a "technician" and "paramedic student" allegedly involved in restraining Jackie.[3] Plaintiffs faulted defendants for failing to adhere to the standards of "The Joint Commission" regarding communicating with and restraining patients, failing to allow Myong to assist in collecting a urine specimen from Jackie, and "forcibly pinn[ing] [Jackie's] entire body by [N]urse Vogt and another male staff person who callously engaged in unconsented application of extreme physical force against

_____

[3] Plaintiffs subsequently voluntarily dismissed with prejudice all claims against Dr. Subramony and all claims against the hospital based on vicarious liability for Dr. Subramony.

a helpless autistic patient."  Plaintiffs alleged defendants had breached the standard of care "for communication" and for "physical management," referencing the "physical restraint procedures implemented" by defendants.

Plaintiffs pleaded ten causes of action:  reckless and negligent medical malpractice, in which plaintiffs alleged defendants had failed "to provide adequate, timely, competent medical treatment" for Jackie and had "caus[ed] her to suffer cardiac arrest by placing her under severe duress that foreseeably would have caused anyone to hyperventilate"; wrongful death under N.J.S.A. 2A:31-1 to -6; breach of contract for medical services; "Survival Act Claim," in which plaintiffs alleged the "terror" defendants had created in Jackie "caused her to hyperventilate," "to suffer severe psychiatric fears" and "a massive cardiac arrest . . . ."; lack of consent; lack of informed consent; assault and battery; intentional and negligent infliction of emotional distress[4]; and "[h]ospital [l]iability," in which plaintiffs alleged the hospital was directly and vicariously liable for its failure to have a policy in compliance with "The Joint Commission," to train the emergency-room staff, to enforce compliance with "the standards," and to have an emergency room "minimally capable of servicing an autistic patient."

---

[4]  Plaintiffs subsequently did not oppose summary judgment on the claims for assault and battery and intentional and negligent infliction of emotional distress.

In the answer filed on behalf of the hospital and Dr. Jetley, defendants identified Dr. Jetley as "a board[-]certified emergency room M.D." In her answer, Dr. Readie described herself as "a board-certified emergency medicine specialist" and asserted as a separate defense that plaintiffs had failed to comply with the Affidavit of Merit statute, N.J.S.A 2A:53A-26 to -29. In her answer, Dr. Park demanded plaintiffs submit an affidavit of merit, asserting she was a "hospital resident . . . held to the standard of care of a general practitioner." In his answer, under a heading "DESIGNATION OF SPECIALTY," Nurse Vogt stated he was "a licensed registered nurse."

After defendants filed their answers, plaintiffs filed "certification[s]" of merit prepared by Dr. Andrew Roy Williams, who stated he specialized in "emergency medicine" and opined defendants had deviated from the standard of care in "the field of medicine generally and in emergency medicine"; Dr. Lee Wachtel, who stated she specialized in psychiatry and opined defendants had deviated from the standard of care "in the field of medicine"; Dr. Robert Stark, who stated he specialized in cardiology and opined defendants had deviated from the standard of care in "the field of medicine generally and in cardiology and emergency medicine"; Dr. Stephen Falk, who stated he specialized in the field of otolaryngology and opined defendants had deviated from the standard

8

of care in "the field of medicine generally and in emergency medicine"; and Jeanine Frumenti, who stated she was a "practicing registered nurse" specializing in "emergency medicine and nursing practices" and opined "the non-doctor defendants" had deviated from the standard of care "in the field of medicine generally and in emergency medicine."

On July 16, 2018, Judge Mary F. Thurber conducted a conference pursuant to Ferreira v. Rancocas Orthopedic Associates, 178 N.J. 144 (2003). Defendants raised various objections to the certifications of merit filed by plaintiffs, arguing they failed to comply with the Affidavit of Merit statute. Plaintiffs agreed to cure the deficiencies. In an order issued that day, the judge extended by sixty days the time by which plaintiffs had to file affidavits of merit and scheduled the conference to continue on August 14, 2018.

Plaintiffs subsequently served an affidavit of merit and curriculum vitae (CV) prepared by Dr. Williams, who specified he submitted the affidavit as to Drs. Park, Readie, and Jetley. In his CV, he stated he had become board certified by the American Board of Emergency Medicine on November 16, 2016, after the alleged malpractice had taken place in this case. Plaintiffs served an affidavit of merit and CV prepared by Nurse Frumenti, who specified she submitted the affidavit as to Nurse Vogt, the hospital, and "any other nurse

whose identity may become known in discovery." Plaintiffs submitted an affidavit of merit and CV prepared by Nancy Radoslovich, who described herself as a "practicing [r]egistered [n]urse . . . currently work[ing] in an operating room." She stated she submitted the affidavit as to Nurse Vogt, the hospital, and "any other nurse . . . ." Plaintiffs served an affidavit and CV prepared by Dr. Richard Parker, who stated he was "board certified in internal medicine" and had been a hospital or medical-organization administrator since 2001. He submitted his affidavit as to the hospital and "any hospital administrator whose identity may become known in discovery." Plaintiff served an affidavit of merit and CV prepared by Dr. David Mark Nidorf, who stated he was "a practicing physician with over [twenty] years of experience in the field of emergency medicine." In his CV, he stated he had a board certification in emergency medicine from the American Academy of Physician Specialists since 2000. Dr. Nidorf submitted the affidavit as to Drs. Readie, Jetley, and Park.

During the August 14, 2018 <u>Ferreira</u> conference, defense counsel objected to Dr. Nidorf's affidavit, questioning whether he was board certified in emergency medicine given that the American Board of Medical Specialties (ABMS) listed him on its website as being board certified in family medicine, not emergency medicine. Counsel did not object to the sufficiency of Dr.

Williams's affidavit for purpose of the Affidavit of Merit statute but reserved the right to object to his testimony. The judge issued an order stating the hospital had consented to the sufficiency of Dr. Parker's affidavit as to direct claims against the hospital; counsel for the board-certified defendants, except Dr. Subramony, had stipulated to the sufficiency of Dr. Williams's affidavit; and all physician defendants had reserved their right to object to Dr. Nidorf's affidavit if Dr. Nidorf was not board certified in emergency medicine. The judge ordered plaintiffs' counsel to provide a certification from Dr. Nidorf as to whether he was board certified in emergency medicine and to file a motion regarding the sufficiency of the nurses' affidavits.

On August 21, 2018, plaintiffs filed a certification of Dr. Nidorf, in which he stated he was board certified in emergency medicine "through the American Academy of Physician Specialists since 2000." In an August 22, 2018 letter, counsel for Dr. Subramony advised the court and counsel that Dr. Subramony objected to the sufficiency of Dr. Williams's affidavit because Dr. Williams was not board certified in emergency medicine at the time of the alleged malpractice.

In September and October 2018, plaintiffs submitted certifications of merit prepared by Drs. Lee Wachtel, a psychiatrist; Stephen Falk, an otolaryngologist; and Robert Stark, a cardiologist. They each recognized they

did not specialize in emergency medicine and asserted the care involved in Jackie's case was not limited to or did not involve emergency medicine "as the care involved the taking of urine sample from a hospital patient."

On January 17, 2019, plaintiffs served reports prepared by Drs. Nidorf and Williams. In his report, Dr. Nidorf identified Dr. Park as the doctor who had primarily treated Jackie and Dr. Readie as Dr. Park's attending physician and noted they had been called to Jackie's bedside. Dr. Nidorf said nothing else about Dr. Readie and said nothing at all about Dr. Jetley. In the opinion section of his report, he faulted Dr. Park for inadequate charting and faulted Dr. Park and "other staff members" for not listening to Myong about how to collect a urine sample from Jackie and for not attempting first to obtain a sample by giving Jackie the opportunity to urinate in a cup.

In his report, Dr. Williams stated Dr. Park had evaluated Jackie but did not otherwise mention Dr. Park or make any specific reference of the other individual defendants. Dr. Williams opined generally that Jackie's death was caused by "the acts and omissions of all doctors and nurses, individually and collectively, involved in these early events," presumably meaning the "traumatic urethral catheterization attempt."

On January 17, 2019, plaintiffs served expert reports prepared by Drs. Stark, Parker, and Wachtel, and Nurse Frumenti. In his report, Dr. Stark, the internist and cardiologist, did not make any reference to Drs. Readie or Jetley. He asserted Dr. Park between 6:00 p.m. and 6:15 p.m. had repeatedly attempted unsuccessfully to insert a urinary catheter into Jackie. He opined about the standard of care only in emergency medicine even though he was not board certified in emergency medicine. He concluded the "terror of being . . . physically restrained by strangers . . . precipitated . . . [Jackie's] lethal cardiac arrhythmia." In his report, Dr. Parker, the internist, does not reference Drs. Readie, Jetley, or Park but discussed the hospital and its personnel generally. Similarly, in her report, Dr. Wachtel, the psychiatrist, did not reference Drs. Readie, Jetley, or Park but generally faulted "members of Jackie's Englewood Emergency Department care team." In her report, Nurse Frumenti did not identify any specific actions or omissions of Nurse Vogt and referenced only the "nursing staff" generally.

On January 28, 2019, plaintiffs served the expert reports of Nurse Radoslovich and Dr. Falk, the otolaryngologist. In her report, Nurse Radoslovich set forth what she believed was the applicable nursing standard of care and stated she believed Nurse Vogt had deviated from that standard of care

13

by failing to: "address [Jackie's] unique communication needs by not allowing her mother to remain with her during treatment"; "document that her special needs were addressed"; "communicate effectively with [Jackie's] parents and [Jackie] as to why a urinary catheter was necessary to obtain a urine sample as opposed to a 'clean Catch' sample"; "follow [The Joint Commission] restraint policy that states 'only used when less restrictive interventions are ineffective'"; "to document the need for restraint"; and "to document appropriately the sequence of events that occurred in the emergency room." She also opined about the cause of death.

Dr. Falk also did not specifically identify any actions or omissions of Drs. Readie, Jetley, or Park that caused Jackie harm. He stated he was "familiar with the standards of care applicable to the otolaryngologic treatment of patients like Jackie" and opined "multiple seizures in [the ER] . . . lead to [Jackie's] premature death."

On February 5, 2019, the hospital and Dr. Jetley moved to bar expert testimony regarding hospital staff for which plaintiffs had not submitted an affidavit of merit and to limit the testimony of plaintiffs' designated expert witnesses Drs. Nidorf, Williams, Wachtel, Stark, and Parker and Nurse Frumenti to the extent the expert witnesses in their reports (1) made vague, generic

references to hospital staff members not identified in any affidavit of merit; (2) referenced people not named as defendants; and (3) offered opinions on the standard of care applicable to emergency-medicine physicians and nurses when they did not share the same specialty or were not otherwise qualified to offer those opinions. A week later, the hospital and Dr. Jetley filed a similar motion regarding plaintiffs' expert witnesses Dr. Falk and Nurse Radoslovich. Dr. Readie and Englewood cross-moved for similar relief.

At oral argument, plaintiffs' counsel acknowledged an expert witness who was not board certified in emergency medicine could not offer an opinion on the standard of care applicable to emergency-room physicians or nurses and stated plaintiffs' expert witnesses would testify about a particular identified person and not "bootstrap others in that expert's opinion." He also conceded Nurse Radoslovich was not qualified to offer a medical opinion regarding Jackie's cause of death.

After hearing oral argument, the motion judge issued an order on March 19, 2019, granting defendants' motions. The order barred plaintiffs' expert witnesses from offering opinions concerning alleged acts or omissions of "persons other than named defendants for whom an [a]ffidavit of [m]erit has been provided" and from "using generic refences to 'staff,' '[emergency

15

department] staff' and other non-specific identifiers." The order barred Drs. Wachtel, Stark, Falk, and Parker and Nurses Frumenti and Radoslovich from offering opinions concerning the standard of care applicable to Drs. Park, Jetley, and Readie and Nurse Radoslovich from opining about any medical diagnosis or causation because those opinions "would be outside the[ir] respective areas of expertise." In the six months following the issuance of those orders, plaintiffs did not serve any new or supplemental expert reports.

After conducting a conference, Judge Thurber on September 13, 2019, issued an order extending the discovery period to April 10, 2020, and requiring the parties to complete party and fact-witness depositions by November 11, 2019, plaintiffs to serve supplemental expert reports no later than December 11, 2019, defendants to serve all expert reports no later than February 10, 2020, and the parties to complete expert depositions by April 10, 2020. The order directed the parties to contact the court to "resolve disputes or difficulties in complying with this [o]rder."

Plaintiffs did not serve any supplemental expert reports by the court-ordered deadline of December 11, 2019, nor did they inform the court they were having any difficulty complying with the deadlines set forth in the court's order or otherwise seek an extension of time to serve supplemental expert reports. The

16

hospital and defendant doctors served expert reports before the February 10, 2020 deadline.

On February 6, 2020, Dr. Park moved to bar plaintiffs' expert witnesses Drs. Nidorf and Williams from testifying against her. Dr. Park argued Drs. Nidorf and Williams had issued net opinions under the wrong standard of care and were not qualified to opine about Dr. Park, who was a second-year internal-medicine resident subject to the standard of care of a general practitioner when she treated Jackie. The hospital and Drs. Jetley and Readie subsequently moved or cross-moved to bar Drs. Nidorf and Williams from testifying against them. The hospital and Dr. Jetley argued (1) Dr. Nidorf had not been certified by ABMS but by the American Academy of Physician Specialists, which was not recognized as a certifying board in N.J.S.A. 2A:53A-41, which is part of the New Jersey Medical Care Access and Responsibility and Patients First Act (Patients First Act), N.J.S.A. 2A:53A-37 to -42; (2) Dr. Williams was not board certified until after defendants' May 12, 2016 treatment of Jackie; (3) Dr. Williams was not a nurse and not qualified to testify about nursing care; and (4) neither doctor had opined about the standard of care applicable to Dr. Jetley or how Dr. Jetley had deviated from a standard of care. Dr. Readie made similar arguments. Nurse Vogt joined in the hospital's and Drs. Park's and Jetley's

17

motions. Plaintiffs opposed defendants' motions and moved to amend the complaint to identify Kathleen Cookson as defendant "Kathy Doe."

During oral argument on February 28, 2020, plaintiffs' counsel conceded Dr. Nidorf had held Dr. Park to the standard of care of an emergency-room doctor and was not "qualified to express an opinion as to [Dr. Jetley]." Plaintiffs' counsel also conceded Dr. Williams had not "name[d] Dr. Jetley by name" in his report and plaintiffs did not have any evidence to contradict hospital records establishing Dr. Jetley had left the hospital before the attempted catheterization. Plaintiffs' counsel confirmed plaintiffs were not submitting Drs. Nidorf or Williams as expert witnesses concerning Nurse Vogt.

The judge granted Dr. Park's motion, finding plaintiffs' experts in their reports had "not identif[ied] the standard of care for Dr. Park identifying her . . . in her proper capacity." The judge granted defendants' motion as to Dr. Jetley because (1) plaintiffs' experts did not identify a standard of care applicable to Dr. Jetley or explain how he had breached any applicable standard of care and (2) neither Dr. Nidorf nor Dr. Williams was qualified to testify against Dr. Jetley given that Dr. Nidorf was not board certified by ABMS and Dr. Williams was not board certified at the time of the alleged malpractice. For the same reasons and because it was undisputed Dr. Readie's first contact with Jackie was after

the attempted catheterization and her first seizure, the judge granted Dr. Readie's cross-motion. That same day, the judge issued four orders barring Drs. Nidorf and Williams from testifying against Drs. Park, Jetley, and Readie and Nurse Vogt and the hospital as to alleged acts of those individuals.

The judge denied plaintiffs' motion to amend the complaint to add Cookson as a party defendant. The judge found the amendment would be futile because the claim against Cookson would be barred by the statute of limitations and plaintiffs had not acted with the required due diligence to amend the complaint to name Cookson pursuant to the fictitious-defendant rule, R. 4:26-4.

Defendants subsequently moved or cross-moved for summary judgment. Plaintiffs opposed those motions and moved for reconsideration of the February 28, 2020 orders barring Drs. Nidorf and Williams from testifying and for leave to "supplement discovery" with "supplemental [expert] reports."

After hearing oral argument, the judge denied plaintiffs' motions, granted summary judgment in favor of the defendant doctors, granted the hospital's motion as to liability based on the defendant doctors, and reserved decision on Nurse Vogt. The judge issued orders memorializing those decisions on April 9, 2020. The judge subsequently granted summary judgment in favor of Nurse Vogt and the hospital for any alleged vicarious liability associated with Nurse

Vogt's alleged acts or omissions and heard oral argument and granted the hospital's summary-judgment motion on the remaining direct claims against the hospital.

On appeal, plaintiffs argue the trial court erred in (1) granting defendants' motions to bar certain expert testimony, which, according to plaintiffs, were improper and premature motions in limines; (2) not rejecting any of defendants' expert-based arguments given that any issues regarding the experts were addressed during <u>Ferreira</u> conferences and were waived by defendants, the treatment at issue did not involve defendants' specialties, and the Nidorf and Williams reports were not impermissible net opinions; (3) granting defendants' summary-judgment motions because plaintiffs' affidavits of merit and other submissions identified the defendants about whom plaintiffs' experts would testify, expert testimony was not needed under the common-knowledge exception, and the motions were premature because discovery was on-going; and (4) in denying plaintiffs' motions to amend the complaint, for reconsideration, and to submit supplemental expert reports.

II.

We review a grant of summary judgment "de novo and apply the same standard as the trial court." <u>Rios v. Meda Pharm., Inc.</u>, 247 N.J. 1, 13 (2021).

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016) (quoting R. 4:46-2(c)). "An issue of material fact is 'genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact.'" Grande v. St. Clare's Health Sys., 230 N.J. 1, 24 (2017) (quoting Bhagat v. Bhagat, 217 N.J. 22, 38 (2014)).

An allegation is not enough to defeat summary judgment; the non-moving party "must produce sufficient evidence to reasonably support a verdict in its favor." Invs. Bank v. Torres, 457 N.J. Super. 53, 64 (App. Div. 2018), aff'd and modified by 243 N.J. 25 (2020); see also Sullivan v. Port Auth. of N.Y. & N.J., 449 N.J. Super. 276, 279-80 (App. Div. 2017) (explaining that "bare conclusions" lacking "support in affidavits" are "insufficient to defeat [a] summary judgment motion"). When determining if a genuine issue of material fact exists, the judge must determine "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 533 (1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)); see also Petro-Lubricant Testing Lab'ys, Inc. v. Adelman, 233 N.J. 236, 257 (2018). We do not defer to the trial court's legal analysis. RSI Bank v. Providence Mut. Fire Ins. Co., 234 N.J. 459, 472 (2018).

We review a trial judge's reconsideration, discovery, and evidentiary rulings, including decisions regarding expert witnesses, under the abuse-of-discretion standard. State v. Garcia, 245 N.J. 412, 430 (2021) (evidentiary); Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021) (reconsideration); State v. Brown, 236 N.J. 497, 521 (2019) (discovery); Townsend v. Pierre, 221 N.J. 36, 52 (2015) (expert). We do not substitute our judgment for the trial judge's judgment unless the trial judge's "ruling is 'so wide of the mark' that it constitutes 'a clear error in judgment,'" Garcia, 245 N.J. at 430 (quoting State v. Medina, 242 N.J. 397, 412 (2020)), or is based on a "misapplication of the law," Cap. Health Sys., Inc. v. Horizon Healthcare Servs., Inc., 230 N.J. 73, 79-80 (2017).

In addition to those standards of review, in deciding this appeal we are guided by the following cornerstone principle of medical-negligence law: "To

22

prove medical malpractice . . . 'a plaintiff must present expert testimony establishing (1) the applicable standard of care; (2) a deviation from that standard of care; and (3) that the deviation proximately caused the injury.'" Haviland v. Lourdes Med. Ctr. of Burlington Cnty., 250 N.J. 368, 384 (2022) (quoting Nicholas v. Mynster, 213 N.J. 463, 478 (2013)).

A.

Regarding the March 19, 2019 order limiting the scope of plaintiffs' expert witness's opinions, plaintiffs label the motions that led to that order as "motions in limine" and fault Judge Thurber for considering them prematurely instead of leaving them to the trial judge to decide, citing Cho v. Trinitas Regional Medical Center, 443 N.J. Super. 461, 470-71 (App. Div. 2015), and McLean v. Liberty Health System, 430 N.J. Super. 156, 160 (App. Div. 2013). In making that argument, plaintiffs forget the concessions their attorney made during oral argument and misconstrue Cho and McLean.

In the March 19, 2019 order, the judge barred plaintiffs' expert witnesses from opining about "persons other than named defendants for whom an [a]ffidavit of [m]erit has been provided" and about standards of care outside their areas of expertise and from using generic references. When asked if he had any argument to make in response to defendants' contention that pursuant to

Nicholas, 213 N.J. 463, plaintiffs' expert witnesses could not "offer opinions on standard of care issues applicable to emergency room physicians," plaintiffs' counsel responded, "No, Judge." When asked if plaintiffs were contesting the merits of defendants' argument concerning the experts' use of generic references to unnamed employees and opining about employees not named as defendants, plaintiffs' counsel responded, "No, Judge. We . . . have seven named defendants." When asked if it was "fair to say that the experts will be limited from any sort of . . . generic or group references to other people . . . an actor who was not identified as to which there wasn't an affidavit of merit," plaintiffs' counsel answered, "Correct, Judge." In the order, the judge also barred Nurse Radoslovich from opining about any medical diagnosis or causation as being outside her area. During oral argument, plaintiffs' counsel advised the judge that the motions as to Nurse Radoslovich was "unopposed." In the March 19, 2019 order, Judge Thurber memorialized the concessions plaintiffs' counsel had made during oral argument.

Plaintiffs' reliance on Cho and McLean is misplaced. In McLean, 430 N.J. Super. at 165, we held the trial court had erred in limiting the number of expert witnesses based on an alleged duplication of evidence – an issue not raised before or found by Judge Thurber. In Cho, we faulted a trial court for deciding

A-4020-19

the defendant's motion on the eve of trial, thereby violating the plaintiff's due-process rights by depriving him of the time provided in the Rules of Court to oppose the motion. 443 N.J. Super. at 472-75. Had Judge Thurber treated these motions like motions in limine and waited until the eve of trial to decide them, she would have made the same mistake the trial judge in Cho made and would have deprived plaintiffs of their due-process rights. Instead, by deciding the motions when she decided them, Judge Thurber gave plaintiffs the appropriate time to respond to the motions, brought necessary clarity to the case, and gave plaintiffs time to cure any deficiencies.

B.

Plaintiffs contend the judge erred in granting defendants' motions to bar the testimony of Drs. Nidorf and Williams in the February 28, 2020 orders because (1) defendants had waived any objections to plaintiffs' expert witnesses in the Ferreira conferences; (2) the treatment at issue did not involve defendants' specialties; and (3) the reports were not impermissible net opinions. Perceiving no abuse of discretion in Judge Thurber's decision to grant defendants' motions, we affirm.

1.

In their waiver argument, plaintiffs conflate the Affidavit of Merit statute, N.J.S.A 2A:53A-26 to -29, and the Patients First Act, N.J.S.A. 2A:53A-37 to -42. The Affidavit of Merit statute addresses the affidavit a plaintiff in a professional malpractice case must submit in the early stages of the case to establish as a threshold matter that his or her claim has merit. See Buck v. Henry, 207 N.J. 377, 382 (2011) ("In the early stages of a medical malpractice action, a plaintiff must provide an affidavit from an equivalently credentialed physician attesting 'that there exists a reasonable probability that the' defendant physician's treatment 'fell outside acceptable professional' standards." (quoting N.J.S.A. 2A:53A-27)). "The core purpose underlying the statute is 'to require plaintiffs . . . to make a threshold showing that their claim is meritorious, in order that meritless lawsuits readily could be identified [and dismissed] at an early stage of litigation.'" Ryan v. Renny, 203 N.J. 37, 51 (2010) (quoting In re Petition of Hall, 147 N.J. 379, 391 (1997)). See also Meehan v. Antonellis, 226 N.J. 216, 228 (2016) (purpose of Affidavit of Merit statute is "to weed out frivolous claims against licensed professionals early in the litigation process").

The Patients First Act establishes the required qualifications of a medical-malpractice plaintiff's testifying expert. Specifically, N.J.S.A. 2A:53A-41 of

the Patients First Act "requires that plaintiffs' medical expert must 'have specialized at the time of the occurrence that is the basis for the [malpractice] action in the same specialty or subspecialty' as defendant physicians." Nicholas, 213 N.J. at 468 (quoting N.J.S.A. 2A:53A-41) (alteration in the original). Pursuant to the Patients First Act, a plaintiff "cannot establish the standard of care through an expert who does not practice in the same medical specialties as defendant physicians," id. at 468, and who is not "equivalently credentialed in the same specialty or subspecialty as the defendant physician," id. at 467.

Whether plaintiffs met the standard under the Affidavit of Merit statute does not relieve them of their obligation to meet the requirements of the Patient First Act. In Nicholas, one defendant physician had been board certified in emergency medicine and another in family medicine. 213 N.J. at 469. The plaintiff submitted affidavits of merit from two doctors who were board certified in internal medicine. Id. at 471. The emergency-medical defendant moved for summary judgment based on the plaintiff's failure to submit an affidavit of merit from an emergency-medicine specialist but subsequently withdrew that motion. Ibid. The record did not indicate whether the family-medicine defendant had objected to an affidavit of merit. The plaintiff submitted an expert report from one of the internists who had submitted an affidavit of merit. Defendants moved

27

to bar the plaintiffs' use of that internist as an expert witness "on the ground that, under N.J.S.A. 2A:53A-41, [he] did not have the requisite credentials to testify to the standard of care applicable to board-certified physicians in emergency medicine and family medicine" and moved for summary judgment because the plaintiffs did not have the expert testimony necessary to establish the applicable standard of care. Id. at 473-74.

Even though the defendants effectively had accepted the internist's affidavit of merit, the Court reversed the denial of defendants' summary-judgment motions, holding the plaintiff had failed to meet the requirement under the Patients First Act that a plaintiff's testifying medical expert at the time of the alleged malpractice be equivalently credentialed in the same specialty as the defendant doctor. Id. at 468. Thus, a failure to object to an affidavit of merit under the Affidavit of Merit statute does not constitute a waiver of the right under the Patients First Act to have a plaintiff prove his case through the testimony of a qualified expert.

Contrary to plaintiffs' blanket assertion about waiver, some defense counsel had raised concerns about Dr. Nidorf and Dr. Williams in the course of the Ferreira conferences. Some questioned whether Dr. Nidorf was board-certified in emergency medicine according to ABMS, questioned whether Dr.

Williams was board certified in emergency medicine at the time of the alleged malpractice in this case, and expressly reserved the right to object to Dr. Williams's testimony. Moreover, defendants' motions to bar the testimony of Drs. Nidorf and Williams were not based on the Affidavit of Merit statute but plaintiffs' failure to meet the statutory qualifications for expert testimony under the Patients First Act. As in Nicholas, even if defendants did not object to plaintiffs' affidavits of merit under the Affidavit of Merit statute, that does not constitute a knowing waiver of their rights under the Patients First Act and does not prevent them from moving to bar testimony pursuant to the Patients First Act.

2.

Labelling this case as a routine urine-collection case, plaintiffs contend the treatment at issue did not involve defendants' specialties and, consequently, plaintiffs did not have to support their case with testimony from a qualified specialist. To accept that argument, we would have to ignore the facts of this case. And that we cannot do. "It is not the label placed on the action that is pivotal but the nature of the legal inquiry." Couri v. Gardner, 173 N.J. 328, 340 (2002). Instead of focusing on a label, "courts should determine if the claim's

underlying factual allegations require proof of a deviation from the professional standard of care applicable to that specific profession." Ibid.

Myong brought Jackie, who was autistic and had a history of seizures, to the emergency department of the hospital not simply for the collection of a specimen for a urine test but because Jackie had not been eating for days and her neurologist was concerned she might have a bladder or urinary-tract infection or pneumonia. At the hospital, Jackie was running a fever, was dehydrated, and had a severely-distended abdomen. Blood tests showed Jackie had an elevated white blood count. Considering as we must those circumstances in their entirety, we are convinced, contrary to plaintiffs' contention, that defendants' treatment of Jackie involved the practice of emergency medicine. See Nicholas, 213 N.J. at 469 n.1 (stating emergency-medicine doctors "focus 'on the immediate decision making and action necessary to prevent death or any further disability'" and "provide 'immediate recognition, evaluation, care, stabilization and disposition of a generally diversified population of adult and pediatric patients in response to acute illness and injury.'" (quoting ABMS Member Boards, Emergency Medicine, http://www.certificationmatters.org/ abms-member-boards/emergency-medicine.aspx (last visited Apr. 9, 2013))).

A-4020-19

Consequently, plaintiffs had to support their case with testimony from a qualified emergency-medicine specialist.

We also find meritless plaintiffs' argument that they were relieved of that obligation because Drs. Jetley and Readie did not state in their answers that the treatment at issue involved their specialty. Judge Thurber found plaintiffs were aware throughout the litigation that defendants had claimed their treatment of Jackie involved emergency medicine and that to hold otherwise would be "inconsistent with everything that has taken place . . . in the case up to this point." We see no basis to disturb that finding, which is supported by the record.

3.

Plaintiffs fault the judge for granting defendants' motions barring the testimony of Drs. Nidorf and Williams as insufficient net opinions, contending Drs. Nidorf and Williams had given in their reports the whys and wherefores of their opinions and had articulated sufficiently and accurately the applicable standard of care, defendants' deviations from the applicable standard of care, and how defendants' deviations from the standard of care caused injury. We disagree and affirm.

To testify against a defendant doctor, an expert witness must actually discuss the defendant doctor in his or her report. Neither Dr. Nidorf nor Dr.

Williams mention Dr. Jetley in their reports. Dr. Williams said nothing about Dr. Readie in his report. Dr. Nidorf's generic references to "other staff members" and Dr. Williams's reference to "all doctors" are insufficient and do not constitute an articulation of what standard of care applied to Drs. Jetley or Readie, how those two doctors deviated from the applicable standard of care, or how their alleged deviation proximately caused injury. See Haviland, 250 N.J. at 384 (finding a medical-malpractice plaintiff must present "expert testimony establishing (1) the applicable standard of care; (2) a deviation from that standard of care; and (3) that the deviation proximately caused the injury" (quoting Nicholas, 213 N.J. at 478)). That they may have mentioned Drs. Readie or Jetley in prior affidavits does not excuse their failure to opine about them in their reports.

Dr. Nidorf merely identified Dr. Readie as Dr. Park's attending physician who had been called to Jackie's bedside after Jackie pulled out her IV and had a seizure. He did not state how Dr. Readie had deviated from an applicable standard of care. With nothing more in their reports about these two defendant doctors, Judge Thurber properly barred Drs. Nidorf and Williams from testifying against Drs. Jetley and Readie.

Both Dr. Nidorf and Dr. Williams reference Dr. Park in their reports. For residents, like Dr. Park, the applicable standard of care is the same as that for a general practitioner. Clark v Univ. Hosp.-UMDMJ, 390 N.J. Super. 108, 115 (App. Div. 2006). In opposition to Dr. Park's motion to bar his testimony, Dr. Nidorf submitted a certification in which he conceded he had held her to the standard of care of an emergency-medicine physician. Because Dr. Nidorf had based his opinions regarding Dr. Park on an inapplicable standard of care, Judge Thurber correctly determined Dr. Nidorf could not testify against Dr. Park.

Dr. Williams did not articulate what standard of care applied to Dr. Park. Instead, he asserted "there was a violation of the standard of care in attempting to obtain a urine sample through the use [of] physical restraint and urinary catheterization despite the obvious and extreme mental and physical distress of the patient." He then identified four "[a]cceptable alternatives that a prudent emergency team may have attempted." An "[a]cceptable alternative" is not the same thing as a standard of care. Judge Thurber reasonably concluded Dr. Williams, like Dr. Nidorf, had based his opinions regarding Dr. Park on a standard of care for an emergency-medicine doctor. Given Dr. Williams's reference to "a prudent emergency team," we see no reason to disturb that conclusion. In addition, Dr. Williams did not articulate how Dr. Park had

33

deviated from any applicable standard of care. He stated only that Dr. Park had "evaluated" Jackie. If his reference to "attempting to obtain a urine specimen through the use of physical restraint and urinary catheterization" was his attempt to identify a deviation from a standard of care, Dr. Williams failed to articulate what role, if any, Dr. Park had played in that purported deviation.[5]

Given their reports' multiple deficiencies in critical areas, we perceive no error in the judge's decision to grant defendants' motions and bar Drs. Nidorf and Williams from testifying. Having affirmed the February 28, 2020 orders granting defendants' motion, we also affirm the April 9, 2020 order denying plaintiffs' motion for reconsideration of those orders.

C.

As a result of the March 19, 2019 and February 28, 2020 orders, which we affirm, plaintiffs had no expert witness who could testify about the standard of care that applied to the defendant doctors, deviations from the standard of care by the defendant doctors, or how their deviations proximately caused harm

---

[5] In their reply brief, plaintiffs assert plaintiffs could have relied on the reports of Drs. Wachtel, Stark, and Falk to prove their case against Dr. Park. Even if we were to consider that argument, see Pannucci v. Edgewood Park Senior Hous. – Phase 1, LLC, 465 N.J. Super. 403, 409-410 (App. Div. 2020) (noting it is improper to raise new issues in a reply brief), it is unconvincing. Those doctors expressly based their opinions on a standard of care related to their specialties, not on a standard of care applicable to a general practitioner.

to Jackie. Accordingly, because plaintiffs could not provide the essential expert testimony required to prove medical malpractice, see Haviland, 250 N.J. at 384, Judge Thurber correctly granted the summary-judgment motions as to Drs. Park, Readie and Jetley. And because plaintiffs could not prove the negligence of the defendant doctors, Judge Thurber correctly granted summary judgment as to the hospital on all vicarious-liability claims related to the defendant doctors. Walker v. Choudhary, 425 N.J. Super. 135, 152 (App. Div. 2012) ("[a] verdict which exonerates the employee from liability requires also the exoneration of the employer." (quoting Kelley v. Curtiss, 16 N.J. 265, 270 (1954))); see also G.A.-H. v. K.G.G., 238 N.J. 401, 418 (2019) (after finding plaintiffs could not prove an employee had committed a tort, Court held employer could not be vicariously liable for employee's conduct).

Plaintiffs' expert submissions as to Nurse Vogt were similarly deficient. Plaintiffs' expert Nurse Frumenti referenced Nurse Vogt but only as being at Jackie's bedside at a certain time, dispensing Ativan, and authoring certain notes. She did not identify any deviation by Nurse Vogt from any standard of care. Unlike Nurse Frumenti, plaintiffs' expert Nurse Radoslovich in her report set forth standard-of-care deviations by Nurse Vogt. But that's not enough. A plaintiff in a medical-negligence case must also present "expert testimony

establishing . . . (3) that the deviation proximately caused the injury." Haviland, 250 N.J. at 384 (quoting Nicholas, 213 N.J. at 478). As plaintiffs' counsel conceded during oral argument and as the judge memorialized and found in the March 19, 2019 order, Nurse Radoslovich was not qualified to opine about causation. Plaintiffs did not provide any other expert report with respect to Nurse Vogt establishing that any deviation asserted by Nurse Radoslovich proximately caused injury to Jackie. Without that critical proof of causation, plaintiffs' claim against Nurse Vogt is not legally viable and summary judgment was appropriately granted as to plaintiffs' claims against him and vicarious-liability claims against the hospital based on Nurse Vogt.

In the "Hospital Liability" count of their complaint, plaintiffs allege the hospital was directly liable for its failures to "have a policy in compliance with The Joint Commission," "train the ER staff," "to enforce compliance with the standards," and "to have an emergency room that is minimally capable of servicing an autistic patient." Each of those direct claims against the hospital required plaintiffs to prove the elements of a negligence claim, including that the hospital had failed in a duty owed to plaintiffs and that that breach of a duty actually and proximately had caused injury. Fernandes v. DAR Dev. Corp., 222 N.J. 390, 403-04 (2015) (identifying elements of a negligence claim); see also

G.A.-H., 238 N.J. at 416 (2019) (to prove negligent supervision or training, a plaintiff must prove the employer "knew or had reason to know that the failure to supervise or train an employee in a certain way would create a risk of harm," "that risk of harm materializes," and the failure to supervise or train "cause[d] the plaintiff's damages"). Given the judge's prior orders, which we affirm, plaintiffs cannot prove that any hospital staff member – whether through lack of training or supervision or the hospital not having a particular policy in place – proximately caused Jackie harm. Accordingly, plaintiffs could not prove their direct-liability claims against the hospital, and Judge Thurber appropriately granted summary judgment as to plaintiffs' direct claims against the hospital.

In their argument for reversal of the summary-judgment orders, plaintiffs rely on Fink v. Thompson, 167 N.J. 551 (2001). That reliance is misplaced. In Fink, the Court addressed whether the plaintiff had substantially complied with the Affidavit of Merit statute. Id. at 565. Judge Thurber granted defendants' summary-judgment motions not based on any failure to comply with the Affidavit of Merit statute but because plaintiffs, lacking the expert testimony required to establish medical malpractice, could not prove their case.

Plaintiffs' argument that the summary-judgment motions were premature is equally unconvincing.[6] Generally, summary judgment is premature when the opposing party has not yet had an opportunity to conduct discovery and develop facts on which he or she intends to base his or her claims. Friedman v. Martinez, 242 N.J. 449, 472 (2020) (cautioning against granting summary judgment when discovery is incomplete and "critical facts are peculiarly within the moving party's knowledge" (quoting James v. Bessemer Processing Co., 155 N.J. 279, 311 (1998))). A summary-judgment motion is not premature merely because discovery has not been completed, unless the plaintiff is able to "demonstrate with some degree of particularity the likelihood that further discovery will supply the missing elements of the cause of action." Friedman, 242 N.J. at 472-73 (quoting Badiali v. N.J. Mfrs. Ins. Grp., 220 N.J. 544, 555 (2015)). Plaintiffs fail to meet that standard.

Plaintiffs assert they had until the close of discovery to "update, modify or supplement" their expert reports. That assertion, made with no legal support,

---

[6] Plaintiffs also seem to argue the hospital moved too late for summary judgment on the direct-liability claims against it, contending the hospital should have moved on those claims when it moved for summary-judgment on the vicarious-liability claims against it. But no court rule or order required the hospital to move on those issues at the same time or to file its motion on the direct-liability claims before it did.

is contrary to the September 13, 2019 order, in which the judge extended discovery to April 10, 2020, required the parties to complete all party and fact witness depositions by November 11, 2019, and plaintiffs to serve supplemental expert reports no later than December 11, 2019, and directed the parties to contact the court to "resolve disputes or difficulties in complying with" the order. Plaintiffs failed to meet that deadline or advise the court before the deadline passed that they needed more time to comply with it. Plaintiffs had a full and extended opportunity to conduct discovery and have not demonstrated that additional discovery would have supplied the missing elements of their case.

Plaintiffs rely on the common-knowledge doctrine.[7] Under the common-knowledge doctrine, "a malpractice case against a licensed professional may present triable issues without resort to the testimony of an expert. In such a case the jury itself is allowed 'to supply the applicable standard of care and thus to obviate the necessity for expert testimony relative thereto.'" Rosenberg v.

---

[7] Plaintiffs argue in their reply brief expert testimony was not necessary because Myong should have been allowed to offer a lay opinion to the jury about her ability to collect from Jackie a reliable clean catch urine sample. We decline to consider that argument, which was improperly raised for the first time in an appellate reply brief and not raised before the trial court. See Alloco v. Ocean Beach & Bay Club, 456 N.J. Super. 124, 145 (App. Div. 2018) (applying "well-settled" principle that an appellate court will not consider an issue that was not raised before the trial court); State v. Amboy Nat'l Bank, 447 N.J. Super. 142, 148 n.1 (App. Div. 2016) (deeming waived an issue raised first in a reply brief).

Cahill, 99 N.J. 318, 325 (1985) (quoting Sanzari v. Rosenfeld, 34 N.J. 128, 141 (1961)). See also Zuidema v. Pedicano, 373 N.J. Super. 135, 147 (App. Div. 2004) (when the common knowledge exception applies, the standard of care need not be established by expert testimony). "The basic postulate for the application of the common knowledge doctrine in a malpractice action 'is that the issue of negligence is not related to technical matter peculiarly within the knowledge of the licensed practitioner.'" Rosenberg, 99 N.J. at 325 (quoting Sanzari, 34 N.J. at 142).

"The most appropriate application of the common knowledge doctrine involves situations where the carelessness of the defendant is readily apparent to anyone of average intelligence and ordinary experience." Ibid. It is unusual to invoke the common knowledge doctrine in a medical-malpractice case. Ibid.; see also Komlodi v. Picciano, 217 N.J. 387, 409-410 (2014) ("In medical malpractice cases, the standard of care generally is not a matter of common knowledge and must be established by experts . . . ."). Examples of circumstances falling under the common-knowledge exception include a dentist extracting the wrong tooth, Hubbard v. Reed, 168 N.J. 387, 396-97 (2001), a doctor reading specimen identification numbers as actual test results, Palanque v. Lambert-Woolley, 168 N.J. 398, 407-08 (2001); and a surgeon leaving a

sponge in a patient after an operation, <u>Buckelew v. Grossbard</u>, 87 N.J. 512, 526-27 (1981).

Plaintiffs assert, without any support, it is common knowledge that defendants should have given Myong a cup to obtain a urine sample from Jackie. We disagree. This case involves a patient with autism and a history of seizures who had not been eating for days and had a severely-distended abdomen, a fever, and an elevated white blood count, and was brought to the hospital's emergency department on the advice of her treating neurologist who was concerned she had a bladder or urinary-tract infection or pneumonia. Determining what needed to be done to determine the source of a possible infection, what tests to perform, how to perform those tests, what samples to collect from that patient, whether it was necessary to collect sterile samples, and how to collect those samples under those circumstances is beyond the common knowledge of the average juror.

D.

We perceive no abuse of discretion in the judge's denial of plaintiffs' motion for leave to amend and motion for leave to serve supplemental discovery. Accordingly, we affirm those orders.

Plaintiffs filed their complaint on April 25, 2018. Plaintiffs named as a fictitious defendant "Kathy Doe," who was "a technician . . . involved in the

forcible restraining of Jackie . . . ."  Plaintiffs named the fictitious defendant "Kathy" based on medical records already in plaintiffs' possession identifying the technician by her first name.  Plaintiffs had the full name and address of Kathleen Cookson by at least September 25, 2019.  Plaintiffs did not serve a subpoena on Cookson until January 2020, after the close of fact discovery.  In response to defendants' motions to bar the testimony of Drs. Nidorf and Williams, plaintiffs on February 20, 2020, cross-moved to amend the complaint to clarify Cookson was Kathy Doe.

Rule 4:26-4 permits a plaintiff to move to amend a complaint to state a fictitious defendant's true name, even if the statute of limitations has run.  However, Rule 4:26-4 requires a plaintiff to demonstrate two phases of due diligence:  (1) before filing the original complaint naming the fictitious defendant, a plaintiff must exercise due diligence in attempting to identify the responsible defendants; and (2) a plaintiff must act with due diligence in ascertaining the fictitious defendant's true name and substituting it upon learning that defendant's identity.  Baez v. Paulo, 453 N.J. Super. 422, 439 (App. Div. 2018).  Judge Thurber found plaintiffs had failed to demonstrate the required due diligence.  The record contains no evidence of any effort by plaintiffs to identify Cookson pre-suit.  Plaintiffs knew her identity no later than September

42

25, 2019, but waited almost five months to move to amend the complaint to name her. That delay does not bespeak of diligence. Judge Thurber did not commit any error or abuse her discretion in denying plaintiffs' motion to amend.

Between the issuance of the March 19, 2019 order, which put plaintiffs on notice of deficiencies in their expert reports, and the September 13, 2019 case management order, plaintiffs took no action to supplement their expert reports. In the September 13, 2019 order, the judge set a December 11, 2019 deadline for plaintiffs to serve supplemental expert reports. Plaintiffs did not comply with that court-ordered deadline, did not contact the court as directed to resolve any difficulties in complying with that deadline, did not cross-move to supplement their expert reports in response to defendants' motions to bar the testimony of Drs. Nidorf and Williams, and did not move to extend that deadline until after defendants had served their responsive expert reports and filed summary-judgment motions. Judge Thurber concluded plaintiffs had made a "tactical decision to present limited expert reports and not to supplement those within the allowed time." Plaintiffs failed to articulate a good-faith basis to explain their failure to comply with the court-ordered deadline or to extend that deadline. See R. 4:24-1(c) (setting a good-cause standard for the extension of a discovery deadline before the court has scheduled arbitration or trial). Judge

Thurber did not abuse her discretion in denying plaintiffs' motion to submit supplemental expert reports.

We find insufficient merit in plaintiffs' remaining arguments to warrant discussion in a written opinion, R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION